**THOMAS v. JAMES et al.**

No. 8512—Opinion Filed April 23, 1918.

(171 Pac. 855.)

**1. Marriage—Invalidity—Burden of Proof.**

One who asserts the invalidity of a marriage on the ground that one of the parties to the same has not been divorced from a former living spouse has the burden of proving that a divorce has not been granted to either party to the former marriage. This burden is substantial, and is not met by proof of facts from which mere inferences may be drawn.

**2. Same—Common-Law Marriage.**

Where the facts show that the mutual intention of a man and woman was to consummate marriage, and that they cohabitated as man and wife, holding themselves out to the public and to neighbors as such at all times, a common-law marriage is established, and the burden is upon one who attacks such marriage to conclusively disprove the same or show its illegality or invalidity.

**3. Divorce—Marriage—Re-Marriage to Each Other—Proof.**

It is unlawful for either of the parties to a divorce to marry any other person within six months after the granting of the divorce, but they are not prohibited by law from re-marrying each other within such period, and their remarriage may be shown by facts from which a common-law marriage may be presumed.

**4. Executors and Administrators—Right to Administration—Widow.**

The surviving spouse of an intestate is entitled to letters of administration on the estate of the deceased, or to name some competent person to whom letters shall be issued.

**5. Same—Marriage—Common-Law Marriage—Evidence.**

Facts in the instant case, as set forth in the opinion, examined, and held that a common-law marriage existed between the deceased and the plaintiff in error at the time of the death of the deceased, and that the plaintiff in error as surviving wife is entitled to waive her right to be appointed administratrix of the estate of deceased, and to name a competent person to act in such capacity.

(Syllabus by Stewart, C.)

Error from District Court, Tulsa County; Conn Linn, Judge.

Missouri A. Thomas, Mabel E. Walters, and Jacob Thomas each file petition for letters of administration on the estate of John Thomas, deceased. From judgment of the district court denying the petition of Missouri A. Thomas, and appointing Mabel E. Walters administratrix, Missouri A. Thomas brings error adversely to Rozella James and others. Reversed and remanded, with instructions.

John B. Means and N. J. Gubser, for plaintiff in error.

Hulette F. Aby and Wm. F. Tucker, for defendants in error.

Opinion by STEWART, C. Missouri A. Thomas filed petition in the county court alleging that she was the widow of John Thomas, who died intestate, and as such widow entitled to letters of administration on the estate of the deceased, or the right to name an administrator, the petitioner waiving the right to letters and requesting that N. J. Gubser, a competent and qualified person, be appointed as such administrator. Petition was also filed by Mabel E. Walters, daughter of the deceased by a former marriage, claiming the right to letters, and asserting that the deceased did not leave a surviving wife. Jacob Thomas, brother of the deceased claiming to be an heir of the deceased, asked that letters be issued to Ollie Marshall. The respective petitioners were heard at the same time in the county court, such court finding that the marriage between Missouri A. Thomas and the deceased was void; that he had not been divorced from Mary Thomas, a former wife, and that said Mary Thomas was his surviving wife; that Rozella James, Jennie A. Patterson, and Mabel E. Walters were children of the deceased by such former marriage; that neither the said Mary Thomas nor any of said children were suitable persons to act as administratrix; and that letters of administration should issue to F. M. Rudolf upon his making bond and subscribing the oath required by law. An appeal being duly taken to the district court, and, the matter coming on for hearing, the petitions of Missouri A. Thomas and Jacob Thomas were denied, and the court ordered that Mabel E. Walters, daughter of the deceased, be appointed administratrix upon making bond and subscribing to the oath as required by law. From the judgment of the district court, the petitioner, Missouri A. Thomas, duly prosecutes an appeal.

The only question to be determined is whether or not Missouri A. Thomas was the common-law wife of the deceased at the time of his death. If such relationship existed, Missouri A. Thomas, under section 6245, Revised Laws 1910, had the right to administer on the estate, or to name some competent person to act. There was no issue raised as to the competency of N. J. Gubser, who was named by the petitioner, Missouri A. Thomas, and, if under the facts Missouri A. Thomas is the surviving wife of the deceased, it was the duty of the court to ap-

point N. J. Gubser administrator.

The uncontradicted evidence shows that about 37 years prior to the death of the deceased he contracted a common-law marriage with one Mary Nunn, and as the issue of such marriage there were at the time of his death three surviving children, all adults, to wit, Rozella James, Mabel E. Walters, and Jennie A. Patterson. Jennie A. Patterson having died since the perfection of this appeal, her sole surviving heir, Pearl Laney, has been duly made a party. Mary Thomas nee Nunn, lived with John Thomas for 12 or 14 years, after which time they separated and have not lived together since. About 15 years prior to the death of John Thomas, Mary Thomas remarried, and has continuously resided with her second husband, one Beynes, since the date of their marriage. In 1909 John A. Thomas was married to the petitioner, Missouri A. Thomas, nee Malone. They resided together as husband and wife until February, 1913, at which time Missouri A. Thomas obtained a divorce. There were no children as issue of such marriage, but Missouri A. Thomas had a daughter and young son by a former marriage. After the granting of the divorce John Thomas, whose home was in Tulsa, procured rooms apart from Missouri A. Thomas in another part of the city. A few weeks afterwards, however, he returned to Missouri A. Thomas at their former home, which home had been decreed by the court in the divorce proceedings to Missouri A. Thomas. After his return the two proceeded to cohabit and live together as husband and wife, he at the time saying that the divorce could not separate them, and that they would remain together until death, both agreeing to the proposition. John Thomas at the time told the children that he wanted them to call him father, and to be good to him and their mother. Many of the neighbors testified as witnesses, all of the testimony showing that continuously afterwards the two were recognized as man and wife, and held themselves out to be such; that they continuously resided together and cohabited up to the time of Mr. Thomas' death on March 16, 1915, the children residing with them most of the time, he paying the household expenses and providing for the care and maintenance of the family, paying taxes on the home in which they lived, and introducing Missouri A. Thomas as his wife, acknowledging her children as his children, and assuming the attitude of a father toward them. It appears that Mrs. Thomas was a seamstress, doing sewing for some of her neighbors. These neighbors testified that they were present on different occasions at her home for the purpose of having sewing done; that Mr. Thomas would be present, and that he and Mrs. Thomas assumed toward each other the attitude of husband and wife. There is no testimony to show that there was any doubt in the neighborhood as to such relation existing. On one occasion Mrs. Thomas applied for a position in a restaurant conducted in a building owned by the deceased, and the deceased, hearing of the incident, told the proprietor of the restaurant that his wife, meaning Missouri A. Thomas, did not have to work in a restaurant. At another time he told the proprietor of the restaurant that the son of Mrs. Thomas by a former marriage was his son, and bought a lunch and other articles for the boy at the restaurant. No one testified as to any understanding in the neighborhood that the relations between the deceased and Missouri A. Thomas were other than that of husband and wife. There is no evidence to show that the deceased did not have a divorce from his first wife, Mary Thomas. Missouri A. Thomas waited on the deceased in health and in sickness, attending him during his last illness and making arrangements for the funeral. On the day of his death, however, Mabel E. Walters, his daughter, arrived, and with her came a man from Sapulpa who, from the evidence, appears to have been on very friendly relations with her. This man testified that he sat up with the body on the night of the death, and that, during the conversation, Mrs. Thomas said the deceased always paid her $5 a week for his board, and that Mabel E. Walters, daughter of the deceased, asked Mrs. Thomas whom she wanted to preach the funeral sermon, and that Mrs. Thomas said:

"There is no use to get a preacher; he couldn't do any more than preach his soul in hell."

The evidence shows that Mr. Thomas was a man who drank and gambled considerably, and was not of the highest moral character. Mrs. Thomas says that she did not say anything about her husband paying her $5 a week board. With reference to preaching the funeral, she swears that she said:

"There was no man who wanted to preach a man in hell, and that Mr. Thomas never did go to church, and they don't know a thing about him."

It appears that Mrs. Thomas' son, Emmett, had been confined in the training school at Pauls Valley as a delinquent. A. M. Welch, the prohibition officer of the county, testified that, just before the divorce from Mr. Thomas, she desired him (Welch) to recommend a parol for the boy; that he objected to the boy staying at the

Thomas home because the boy and Mr. Thomas had trouble, and Mr. Thomas' conduct did not help the boy; that Mrs. Thomas assured him that she was suing for divorce, and that he promised her to recommend a parole when she secured the divorce; that after the divorce the boy was accordingly paroled; that about six weeks or two months after the divorce, he saw Mrs. Thomas and told her he did not think she had kept faith with him as Mr. Thomas was living out at her home again, and that Mrs. Thomas either said that Mr. Thomas was boarding or was paying his way, and as he understood it, staying in separate apartments. A grocery man who had done business for about one year in the neighborhood testified that Mrs. Thomas on one occasion conveyed the impression that Mr. Thomas was paying board at $5 per week, but his testimony is vague, and his recollection does not seem to be very distinct.

The foregoing is a fair statement of the facts as shown by the evidence. It is conceded by the parties to this appeal that the marriage of John Thomas and Mary Nunn was valid, and the children of the marriage legitimate. The petitioner, Missouri A. Thomas, does not seek to deprive the children of their right of inheritance as the legitimate children of John Thomas, but merely asserts her rights as the surviving wife of the deceased. It is also conceded that Mrs. Beynes, formerly Mary Thomas, has no right as heir, and that the question of her being divorced is not in issue. We will say, however, that under the uniform holdings of the courts, the burden would be upon those asserting that the divorce had not been granted to show that neither party to such marriage had obtained a divorce, and, it having been shown that both John Thomas and Mary Thomas had contracted second marriages, the presumption of the legality of such marriage must be overcome by those urging the illegality of the same, even to the extent, if necessary, of proving a negative. It must follow that the presumption is that the marriage of John Thomas and Missouri A. Thomas in 1909 was legal, but, it being admitted that, in January, 1913, a divorce was obtained, the question left for us to determine is whether or not the evidence is sufficient to indulge the presumption of a valid common-law marriage after the granting of the divorce. A common law marriage duly entered into and established is as binding as a marriage of the most sacramental kind with ceremony performed by the highest dignity of church or state. In Clark v. Barney, 24 Okla. 455, 103 Pac. 598, Mr. Justice Williams, speaking for this court, said:

"It seems to be the rule, where common-law marriages are permissible, that, although no subsequent marriage ceremony is performed, the parties having previously under the forms of law evidencing the contract of marriage, assumed that relation in good faith and innocent of any willful intention to commit wrong, believing that the contract of marriage, was valid, and having continued that relation in good faith for a long period after it could have been legally assumed, the presumption arises that thereby they intended and meant marriage, mutually consenting to a contract of that character."

And it is said by Mr. Chief Justice Sharp of this court in Chancey v. Whinnery, 47 Okla. 272, 147 Pac. 1036:

"Where a marriage has been consummated in accordance with the form of law, the law indulges a strong presumption in favor of its validity. One who asserts the invalidity of such a marriage, because one of the parties thereto has been formerly married, and the spouse of such former marriage is still living, has upon him the burden of proving that the first marriage has not been dissolved by divorce or lawful separation."

See, also, Jones v. Jones, 63 Okla. 208, 164 Pac. 463, L. R. A. 1917E, 921, an opinion by Mr. Justice Hardy.

It is apparent that the petitioner in this case was only required to present by the evidence such a state of facts as would authorize the presumption of a common-law marriage after which the burden was upon the objectors through every stage of the proceedings, and in every material matter, to prove facts showing that such marriage did not exist, or was illegal or void. This burden is not met by the proof of facts from which mere inferences may be drawn, but is a substantial burden which must be shouldered. The interest of society, the protection of the home, and the preserving of the good name of the contracting parties as well as their posterity calls for this inflexible rule. While the failure to observe conventionality on the part of John Thomas and Missouri A. Thomas does not deserve the highest commendation, and their conduct in general may not be regarded as a high standard of ethics or of morals, yet, from the evidence in this case, we are of the opinion that, after the divorce, it was the bona fide intention of each of the parties to assume the marriage relationship with each other, and that their cohabiting together, and conduct toward each other, and with society at large, was such as to establish a bona fide common-law marriage; and that such marriage in fact and in law existed and continued until the time of the death of John A. Thomas. But the defendants in error urge that the cohabitation begun after the divorce was meretri-

cious and illicit in that it commenced before the expiration of six months from the decree of divorce, hence their acts could not ripen into a lawful marriage. The statutes of Colorado provide:

"And during said period of one year from the granting of a decree of divorce neither party thereto shall be permitted to remarry to any other person." Rev. St. 1908, § 2122.

The Supreme Court of Colorado in Matteote v. Matteote et al., 59 Colo. 566, 151 Pac. 448, says in the syllabus:

"Where a man and woman married, lived together for 6 years, entered into a separation agreement, lived apart for 8 months, during which time the husband secured a divorce, and thereafter by mutual consent of the parties ·cohabited together again as husband and wife in the same dwelling without remarriage, there being continuous and mutual acknowledgment of the marriage relation to their neighbors and acquaintances, and they enjoying the reputation, and living separate and apart from others and with one another until the death of the husband, the cohabitation after the divorce for 4½ years was a valid common-law marriage."

Our statute on the subject is similar to that of Colorado; the only material difference being the time within which the marriage is prohibited. The law of this state does not make it unlawful for parties to a divorce proceeding to remarry each other before the expiration of six months, but the statute provides:

"It shall be unlawful for either party to such divorce suit to marry any other person within six months from the date of decree of the divorcement."

This provision was interpreted by the Supreme Court of the Territory in a criminal case (Niece v. Territory, 9 Okla. 535, 60 Pac. 300). The court used this language:

"It will be observed that the indictment charges that, 'Said A. P. Niece, then and there being, did then and there unlawfully, willfully and feloniously, marry and take to wife one N. J. Overman, and to her, the said N. J. Overman, was then and there married within six months from the date of the decree of divorcement.' The section of the statute under which said indictment was drawn expressly provides that, 'It shall be unlawful for either party to such divorce to marry any other person within six months from the date of the decree of divorcement.' Hence it is obvious that the words 'to marry any other person' are a material averment of the indictment. The indictment should have negatived the fact that the said N. J. Overman was not the former wife of the defendant."

The law favors settlement of domestic difficulties and reconciliations between husband and wife. It is evident from the verbiage of the statute that the lawmakers had in mind such reconciliations when the same was enacted and did not intend to prevent a remarriage of the same parties in a divorce proceeding. But it is further urged tht the evidence as to the deceased paying board, and the remarks of Mrs. Thomas concerning the funeral sermon, were sufficient to raise an issue of fact as to the common-law marriage. We do not find that the evidence, if· true, is entirely inconsistent with such relationship. The husband could have paid board and the marriage relationship existed. Such arrangements are sometimes made between husband and wife. The remarks of the mother to the probation officer merely show a mother's solicitude for her son, and were in the nature of an evasion of further questions, which, if answered candidly, might have taken from her the custody of her child. When we take into consideraton the evidence showing the immorality of the deceased, and his failure to attend church, the remark of Mrs. Thomas concerning a preacher is not unusual. Many times, under such circumstances, stern but well-meaning expounders of the gospel, in delivering a funeral discourse make remarks indicating the loss of hope for the soul of the deceased, which, to say the least of it, do not find receptive lodgment in the hearts of the bereaved.

We are of the opinion that the evidence in this case is sufficient to warrant the presumption of a valid common-law marriage between the petitioner, Missouri A. Thomas, and the deceased, and that the petitioner was entitled under the law of this state to name the administrator.

This cause is reversed, with directions to set aside the judgment rendered, and render judgment directing the county court to revoke the letters of administration heretofore granted, and to grant letters to N. J. Gubser, or to any other competent person named by Missouri A. Thomas; the costs of the appeal to be assessed against the defendants in error.

By the Court: It is so ordered.