Marilyn Joyce THOMAS, Appellee,

v.

Max Lee THOMAS, Appellant.

No. 48348.

Court of Appeals of Oklahoma, Division 2.

Nov. 30, 1976.

Rehearing Denied Dec. 23, 1976.

Released for Publication by Order of Court of Appeals March 17, 1977.

John C. Buckingham, Oklahoma City, for appellee.

Jay F. McCown, Oklahoma City, for appellant.

BRIGHTMIRE, Judge.

Max Thomas was adjudged guilty of not complying with a child support order and sentenced to 60 days in jail. He appeals contending he is being punished for violating a void order and the sentence should therefore be vacated. We agree that he is and reverse.

### I

Marilyn Thomas divorced Max on April 14, 1970. In the decree she was given custody of their three-year-old child, and Max was ordered to pay $50 a month for his support. Two weeks later the parties, without effecting a vacation of the decree, resumed a marital relationship which lasted nearly a year. Following a separation in March 1971 Max started paying Marilyn $50 per month for the support of their child and continued such payments for about two years. In the meantime Marilyn married another man. On December 20, 1974 Marilyn asked the court to cite and punish Max for failing, during the previous 16 months or so, to comply with the April 14, 1970 child support order. The court did so. Max appeared and pleaded not guilty because, he said, the child support order he was accused of violating became void as soon as the parties went back together and resumed a marital status.

### II

Max was tried on April 11, 1975. Only he and his wife testified. She acknowledged that the parties got back together shortly after the divorce. There was no ceremonial remarriage, nor was any effort made to vacate the decree, but the couple simply began living together again and holding themselves out as husband and wife. She further testified she considered that her relationship with Max was that of a wife resulting from a common-law marriage which, she confirmed, had never been dissolved.

Max's testimony paralleled Marilyn's. He too considered himself as married to Marilyn after they resumed a marital relationship in May 1970. When the parties separated he says he began paying her $50 per month for child support and continued to do so until about July 1973 and since then had paid only about $100. He conceded that he had not had occasion to raise the question involved here before, nor make any objection to Marilyn's later marriage to another man.

On the basis of this evidence the trial court found that "Max Lee Thomas is in contempt of this Court for his failure to make the child support payments as required by the Decree of Divorce entered by

this Court on April 14, 1970, in the total sum of [$1,000] . . . [and he] is hereby sentenced to serve a term of sixty (60) days in the Oklahoma County jail . . . sentence to commence on this date."

### III

 The relevant law is not in doubt. A divorced couple may remarry each other at any time "and their remarriage may be shown by facts from which a common-law marriage may be presumed." *Thomas v. James*, 69 Okl. 285, 171 P. 855 (1918). And as observed in *Thomas* common-law marriages are valid in this state and when one is entered into it is "as binding as . . . the most sacramental . . . ceremony." Once the parties remarry the jurisdiction of the court with respect to maintenance of their children terminates, *Dunlap v. Dunlap*, 88 Okl. 200, 212 P. 608 (1923), because the divorce is annulled and the rights and duties of the parties with regard to their children are as if they had never been divorced. *Jenkins v. Followell*, Okl., 262 P.2d 880 (1953).

These principles were invoked in *Harrison v. Burton*, Okl., 303 P.2d 962 (1956) to support a holding that post-divorce conduct of the parties—factually similar to that admitted here—created a common-law marriage which until judicially dissolved incapacitated both parties from entering into other nuptial contracts. Said the court: "Emmett and Jennie had been divorced several weeks prior to the time they went to Willa's apartment but if, after the divorce, they cohabited and assumed the marriage relationship with each other and with society at large a bona fide common-law marriage was established." And so it was with the parties in this case according to the undisputed evidence.

### IV

Marilyn argues, however, that the existence of the common-law marriage "is a question of fact . . . [and] the trial court's finding of no common-law marriage . . . is supported by the evidence . . . ." The first part of her statement is too sweeping and must be amended by adding to it that an issue is presented only if the fact is the subject of conflicting material evidence.

The second part of Marilyn's statement implies there was such a conflict and in the body of her argument suggests that there were "facts" established which are inconsistent with the existence of a common-law marriage and therefore justify a finding of its non-existence, namely: (a) after separating from Marilyn, Max failed to file an action for a divorce; (b) after separating Max began to pay child support to Marilyn in the same amount as called for in the divorce decree; (c) Max failed to object to Marilyn's marriage to another person.

 The theory is without merit. If remarry the couple did, then nothing either party did or did not do thereafter could dissolve it. Only a court of law could do that. Thus, so far as the validity of the April 1970 order is concerned, it is completely immaterial whether Max filed for a divorce, paid child support in a certain amount, or remonstrated against his wife's third marriage. Certainly none of the acts or omissions complained of are inconsistent with the testimony of both parties regarding the reestablishment of a nuptial relationship, nor do any of them tend to prove Max entered into the common-law marriage other than in good faith.

In another branch of her argument Marilyn says Max "did not in good faith intend to be married" to her following the divorce but retained "reservations" which prevented the perfection of a common-law contract. Reference is made to some language in *McKee v. State*, Okl.Cr., 452 P.2d 169 (1969) to the effect that "good faith" of the parties is an element to be considered in determining whether a common-law marriage was consummated, and if one of the parties hesitates to make such a contract because he is not sure whether he has the capacity to do so, the hesitancy justifies a finding that none was made. In *McKee* the 21-year-old defendant was charged with the second degree rape of a 15-year-old girl.

His defense was that he married her. The girl testified that while sharing defendant's bed she thought she was married but that defendant said he had called his lawyer and was told he could not marry her because he thought he might still be legally married to another woman and so "he never married me." In other words there was no common-law marriage because the defendant did not agree to one and the reason he did not was because he did not think he legally could—a significant fact not present here.

The other case cited by Marilyn—*Plummer v. Plummer,* Okl., 381 P.2d 839 (1963)—has even less relevance because there the defendant upon being sued for a divorce and child support denied that he had ever agreed to marry or be married to the plaintiff and denied that he fathered the child she sought support for. There was considerable evidence to support the trial court's finding the parties merely fornicated from time to time, and that defendant never intended and therefore did not agree to a common-law marriage.

## V

Nor do we find a basis in the record for the trial judge's belated "finding"[1] that:

"[I]t was apparent from the testimony of the defendant as to his conduct [i. e., paying child support, failing to file for a divorce, etc.] that the common law marriage as testified to by said defendant [Max] was not in good faith and was a mere ruse or artifice by him to relieve himself of his obligation to pay child support; that if any relationship did exist, it was merely a 'sleeping arrangement' for the defendant and . . . the Court found that the defendant was not telling the truth about the alleged common law marriage and that the Court was not going to allow the specious and captious conduct and testimony of the defendant to negate a finding of willful contempt of the Court's order to pay child support to the plaintiff."

1. Two months after entering an order finding Max guilty of contempt, he added some "find-

Not only is there no evidentiary basis for such "findings" but the evidence actually supports contrary conclusions. Marilyn herself admitted their mode of living was that of husband and wife and not a mere "sleeping arrangement." And the fact the second marriage lasted nearly a year coupled with Max's payment of child support for two years thereafter destroys as incredible the notion he resumed a marital relationship only to avoid paying child support. All these "findings" amount to are trial court speculations about what motivated the parties to remarry. It is indeed difficult for us to think of a legal basis for holding that the existence or validity of a contract depends upon it having been entered into for motives meeting with the trial court's approval.

■ Moreover, so far as the trial court's rejection of defendant's testimony as untrue is concerned he is still faced with the problem of needing evidence to support a finding the parties did not remarry. He cannot rely on Marilyn's testimony because she agreed with Max that they did. But we need not linger longer on this primal point because the legal fundamental is that the court is bound by undisputed evidence so long as it is not inherently improbable. *Spillers v. Colby,* Okl., 391 P.2d 895 (1964). It is not here.

■ We hold that the parties entered into a common-law marriage in May 1970 which nullified the earlier child support order. As a consequence the trial court lost jurisdiction to enforce it by contempt proceedings or otherwise.

■ Parenthetically we should also point out that even if the order had been enforceable the commitment order entered by the trial judge here would still be invalid because it is not conditioned on continued failure to pay. *Kelley v. Kelley,* 206 Okl. 188, 242 P.2d 439 (1952); *Hadley v. Hadley,* 129 Okl. 219, 280 P. 1097 (1929).

ings" in an order amending Max's "narrative statement" of the evidence.

## VI

Neither our decision nor the reasons given as to how we reached it should be construed as approving the failure of Max Thomas to support his child. Though the record is silent as to why he quit paying when he did, the fact remains that, married or not, he still owes his child certain legal duties which are enforceable but only through appropriate legal proceedings which, so far as we can tell, have not yet been instituted.

Reversed.

BACON, P. J., and NEPTUNE, J., concur.