Filed 11/18/14

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| ALLYSON HELGESTAD,<br><br>    Plaintiff and Respondent,<br><br>        v.<br><br>GEORGE VARGAS,<br><br>    Defendant and Appellant. | G048888<br><br>(Super. Ct. No. 09P001418)<br><br>O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Paula J. Coleman, Temporary Judge.  (Pursuant to Cal. Const., art. VI, § 21.)  Reversed and remanded.

Law Offices of Milo F. DeArmey and Matthew S. DeArmey for Defendant and Appellant.

No appearance for Plaintiff and Respondent.

\*            \*            \*

# I. INTRODUCTION

Family law is not getting any easier. Consider this scenario: A couple live together and have two children. They do not marry. Then they separate. The couple agree to a paternity action judgment which establishes the father's paternity, his right to visitation, and fixes a monthly monetary child support payment to be made to the mother who will have primary physical custody of the children. Later the couple attempt a reconciliation; the father moves into the residence of the children and the mother. After about nine months, the reconciliation fails, and the father moves out. Issue: Can the father obtain any credit for actual, in-the-home child support he afforded the children during the nine months he lived with them and the mother?

The question is one of first impression in California. (See Wright, *Right to Credit on Child Support Arrearages for Time Parties Resided Together After Separation or Divorce* (2002) 104 A.L.R.5th 605, 610-612 [absence of California cases] (hereinafter "ALR Annot., *Credit for Time Resided*".) Had the original order been made in a marital – as distinct from paternity – action, and had the couple simply switched custody so that the children went to live with the father instead of attempting reconciliation, there seems to be no question that a line of California cases beginning with *Jackson v. Jackson* (1975) 51 Cal.App.3d 363 would allow such credit. In fact, family law has developed a shorthand term for credits. They're called "*Jackson* credits," after the first case to allow for them. But whether the same rules obtain in a paternity action as in a dissolution action has not previously been addressed.

The trial court concluded the father here, appellant George Vargas, was *not* eligible for any such *Jackson* credits, because this case did not fit the *Jackson* pattern of a child support order which originated in a divorce proceeding, and also because there wasn't a total reversal of custody, but rather a period of cohabitation – shared custody – in the context of an attempted reconciliation. We reverse because we believe the same

2

equitable considerations that apply to support orders arising out of marital cases should also apply to support orders arising out of paternity cases. We see no reason to differentiate total changes of custody from periods of living together in the same household; actual support is actual support.

## II. FACTS

The Orange County Superior Court no longer is able to provide court reporters without charge, forcing these parties of limited means to resort to an "agreed" statement – rather than a reporter's transcript – to have meaningful access to appellate review. "The record on appeal may consist wholly or partly of an agreed statement." (Cal. Rules of Court, rule 8.134(a)(1).) Fortunately the parties were able to agree on one, probably because the essential facts are simple: Allyson and George lived together from 2005 to October 2009. During that period they had two children. Allyson and George separated in October 2009. The next month Allyson filed this paternity action (09P001418). In May 2010, the parties agreed to a judgment under which George would pay a certain amount in child support commencing June 1, 2010, and George would be entitled to specified visitation. The judgment was signed by a court commissioner on May 25, 2010, and filed that day.

But sometime between December 2010 and January 2011, George moved back in with Allyson and the children in her residence. During this time he paid "rent" to Allyson's father, who owned the building (she had not been paying any rent previously). George, Allyson and the children all lived together in a family relationship from at least January 2011 until mid-August 2011. George then moved out again. George asked the court for a determination of his arrearages in May 2012. The order on that motion was made in July 2013 and included a determination George was ineligible for any credit for the period of eight or nine months of attempted reconciliation spanning the first two thirds of 2011. George has timely appealed from that order.

3

## III.  DISCUSSION

In denying George credit for any actual child support he might have provided for the couple's two children during the period of reconciliation and living together as a family in 2011, the trial court proffered four reasons.  Three of those reasons apply categorically in such a way as to preclude even the possibility of credit for a payor parent who had moved back in with the children.  The three categorical reasons were:  (1) George was not entitled to "*Jackson* credits" because the *Jackson* line of cases all involved *total* switch-overs of custody where the previously noncustodial parent became the sole custodial parent.[1]  (2) George should have brought a formal Order to Show Cause (OSC) based on changed circumstances when he moved back in with Allyson and the children.  And (3) as a matter of statute (Fam. Code, § 3602[2]), the only relief allowed for support during reconciliation is when the support order is pendente lite, and this was not.  The trial court also gave one factually-based reason:  (4)  George had to have a roof over his own head anyway, so the fact he moved in with Allyson and the children and paid rent to her father merited no credit.

We address each of these considerations below.  But before those reasons can be addressed adequately, a canvass of the relevant case law is required.   No less than three distinct lines of California case law shed light on the problem of whether *Jackson* credits may be available in paternity cases involving reconciliations.  There is also a small body of out-of-state litigation bearing on the issue.  (See ALR Annot., *Credit for Time Resided*, *supra*, 104 A.L.R. 5th 605.)  While none of these are determinative, they inform our decision.

---

[1]     The "*Jackson* line" consists of:  *Jackson, supra*, 51 Cal.App.3d 363, *In re Marriage of Matthews* (1980) 101 Cal.App.3d 811, *In re Marriage of Okum* (1987) 195 Cal.App.3d 176, and *Trainotti, supra*, 212 Cal.App.3d 1072.

[2]     All undesignated statutory references in this opinion are to the Family Code.

4

A.  *The Jackson Equitable Credit Line*

We begin with *Jackson* itself.  *Jackson* addressed the basic pattern:  A married couple divorced, and custody of their teenage daughter was awarded to the mother.  Then, seven months later, the mother agreed to let the daughter live with her father.  When, roughly two years after the change, the father sought to formally modify the decree to eliminate the support payments, the mother "retaliated" by trying to execute on the father's assets based on support arrearages accumulated during the period the daughter had been living with him.  The trial court refused to quash the writ of execution obtained by the mother, ruling the father's modification effort was an attempt to retroactively modify child support.  The appellate court reversed.  (See *Jackson, supra*, 51 Cal.App.3d 363, 365-366.)  The *Jackson* court reasoned that all child support orders are an exercise of the trial court's "equitable power and are designed to compel satisfaction of the child support obligation which exists apart from the marriage status." (*Id.* at pp. 366-367.)  After first briefly referencing a series of five previous opinions[3] that had indicated trial courts have the "equitable" power to deny *enforcement* of a support order when equity requires it (see *id*. at pp. 367-368 [the word "equitable" appears in the *Jackson* court's treatment of each of the five cases]) the court arrived at the essence of the case:  It was undisputed that the father had "provided a home and support" for the daughter after she had commenced living with him, and in doing so had expended amounts in "excess" of the formal order, so the trial court did, indeed, have the discretion to either quash the writ entirely, or permit only partial enforcement of it.  (*Id*. at p. 368.)

---

3       The five cases, excerpts from which *Jackson* relied on, were:  *Spivey v. Furtado* (1966) 242 Cal.App.2d 259; *Parker v. Parker* (1928) 203 Cal. 787; *Lohman v. Lohman* (1946) 29 Cal.2d 144; *Wilkins v. Wilkins* (1950) 95 Cal.App.2d 605 and *Messenger v. Messenger* (1956) 46 Cal.2d 619.  Four are still 100 percent good law. *Parker* was later disapproved over what it had to say about a statute that limits relief to what is requested in the pleadings.  (See *In re Marriage of Lippel* (1990) 51 Cal.3d 1160, 1168.)

Next came *In re Marriage of Matthews, supra,* 101 Cal.App.3d 811, a case which briefly dealt with the issue of a father who provided a home for his children during summer vacation. The trial court reduced the normal child support payments by 50 percent during those months. (*Id*. at p. 819.) Without extended analysis, or any reference to the *Jackson* opinion, the *Matthews* court simply concluded "it is equitable to reduce or terminate child support payments for those full months in which the children reside with the non-custodial parent." (*Ibid*.)

*In re Marriage of Okum, supra,* 195 Cal.App.3d 176 was, like *Jackson,* another writ-of-execution-motion-to-quash case based on the payor parent's having "de facto sole physical custody" of two children, a boy and a girl. (See *id*. at p. 180.) This time, however, since *Jackson* had been on the books for 12 years, the trial court quashed the writ of execution as to the arrearage based on the girl's support. (There was a factual issue as to whether the boy also lived with the father.) Explicitly relying on *Jackson*, the *Okum* court observed that the trial court's order vis-à-vis the girl was correct: The father was entitled to "equitable" relief as to her. (*Id*. at p. 182.) As to the boy, the father lost. The court noted the mother kept a bedroom in her own home for him when he stayed with her, she paid for much of his support when he was in her care, and, overall, the mother "substantially complied with the custody agreement and therefore, [the father] was obligated to pay support." (*Id*. at pp. 182-183.)[4]

The most recent case in the *Jackson* line is *In re Marriage of Trainotti, supra,* 212 Cal.App.3d 1072. Like *Okum*, this case was essentially a replay of *Jackson*, but the opinion provided more doctrinal development. Three years after a child support

---

[4] A minor subtheme in both *Jackson* and *Okum* was the mother's own conduct in the arrangements for which the father would later seek credit. (See *Jackson, supra*, 51 Cal.App.3d at p. 368 [mentions of both "consent" of mother and mother's "acquiesce[ence]" to change of custody of daughter]; *Okum, supra*, 195 Cal.App.3d at p. 182 [reference to mother's compliance with basic custody arrangement].) We think these references are best treated as mere local color and rhetorical buttressing for the results reached by the court. As we stress below, the child support obligation exists independent of the conduct of the payee parent.

6

judgment the minor child began living with his (previously) noncustodial father; the father provided a home but made no more support payments, and about three years after the change of residence the father sought a formal modification of the initial custody and support arrangements. As in *Jackson*, the mother responded by bringing enforcement proceedings based on support arrearages which included the period when the father was the de facto custodial parent. The trial court, just as in the original *Jackson* case, reasoned from the absence of a modification of the initial support order, and so allowed the father no credit. (*Id*. at p. 1074.) And, just as in *Jackson*, the appellate court reversed.

In *Trainotti*, however, the court expanded on the statutory foundation underpinning its reversal of the trial court. *Trainotti* first took issue with the trial court having equated giving a payor parent credit for actual support provided to a child during a period when the child is living with that parent with an improper attempt at retroactive modification of support. (See *Trainotti, supra*, 212 Cal.App.3d at p. 1074, quoting former Civ. Code, § 4700, subd. (a)(1).)[5] The *Trainotti* court then segued to the now 14-year old *Jackson* opinion, with a quote from one of *Jackson's* "'equitable power'" passages (see *Trainotti, supra*, 212 Cal.App.3d at pp. 1074-1075, quoting *Jackson, supra*, 51 Cal.App.3d at p. 368). Noting that the only difference between *Jackson* and the case at hand was that *Jackson* involved a writ of execution while the case at hand involved a modification proceeding, the *Trainotti* court reasoned the trial court's power "to enforce"

---

[5]     At the time *Trainotti* was decided in 1989, the prohibition on retroactive modification was found in former Civil Code section 4700. *Trainotti* said the trial court had taken a too "restrictive" approach to the statute. (*Trainotti, supra*, 212 Cal.App.3d at p. 1074.) Former Civil Code section 4700 provided that "Any order for child support may be modified or revoked as the court may deem necessary, except as to any amount that may have accrued prior to the date of the filing of the notice of motion or order to show cause to modify or revoke."

Now, the prohibition on retroactive modification of child support is found in two statutory provisions. Section 3603 applies to pendente lite orders, and provides such orders may be modified at any time "except as to an amount that accrued before the date of the filing of the notice of motion or order to show cause to modify or terminate." Section 3651 applies to permanent orders. Subdivision (c)(1) of section 3651 says: "Except as provided in paragraph (2) and subdivision (b), a support order may not be modified or terminated as to an amount that accrued before the date of the filing of the notice of motion or order to show cause to modify or terminate." (Paragraph (2) involves National Guard service and subdivision (b) involves supplemental petitions involving children born to the parties prior to the marriage, and so are not relevant here.)

7

an original support order was implicated.  Accordingly, *Trainotti* invoked the language in former Civil Code section 4380 giving a trial court "discretion" to enforce support orders as it from time to time deems necessary.[6]

B.  *The Gregory-McCann Death-of-the-Payor Parent Cases*

There is another line of cases that bears on this issue.  Two published opinions, *In re Marriage of Gregory* (1991) 230 Cal.App.3d 112 and *In re Marriage of McCann* (1994) 27 Cal.App.4th 102 stand for the proposition that a child support order is not *automatically* expunged upon the death of the payee parent.  An explanation of this application is in order.  *Gregory* involved a true deadbeat dad.  There was a permanent child support order made in 1977, the noncustodial father paid almost nothing on it, the children were on welfare during that time, and then in 1981 the custodial mother died.  The children went to live with the mother's parents, still received welfare, and in 1988 the county went after the father for arrearages.  (*Gregory, supra*, 230 Cal.App.3d at p. 114.)  The trial court determined the original support order terminated as a matter of law when the custodial parent died.  The *Gregory* opinion reversed on the theory that the payor parent had to "look for assistance from the courts in order to modify or terminate a support order" and held the order survived the custodial parent's death.  (*Id*. at p. 116.)

*McCann* followed three years later.  *McCann* is easy to misread.  If you don't look closely at the court's statement of facts, you might think that after the payee parent's death the payor father took his daughters into his own home.  He didn't.  Ever. The discussion section of the opinion recites that "The trial court found that upon Leslie McCann's death, Frank assumed custody of his daughters" (*McCann, supra*, 27 Cal.App.4th at p. 106), but when one reads the entire opinion it is clear that in *McCann* "custody" did not mean actual physical custody.  The opinion's statement of facts reveals

---

6       Section 290 now provides:  "A judgment or order made or entered pursuant to this code may be enforced by the court by execution, the appointment of a receiver, or contempt, or by any other order as the court in its discretion determines from time to time to be necessary."  The discretion language from former Civil Code section 4380 on which *Trainotti* relied is now found in current Family Code section 290.

8

that the payee-mother died about two years after a permanent child support order was made, at which point the couple's two daughters lived with their maternal grandmother (they were already there because of the mother's last illness). During this time the payor-father made his regular support payments, first to the mother, and then, after her death, to the grandmother. However, he cut his payment in half for an eight-month period during which one of the daughters lived outside the home of the grandmother. (*McCann, supra*, 27 Cal.App.4th at pp. 104-105.) The reduction resulted in an arrearage which the district attorney's support division tried to collect, but the trial court determined the payor-father had "assumed custody" and therefore the original order terminated. On appeal, the *McCann* court reasoned the payor-father could not "unilaterally terminate" the order; that had to be done by "an impartial third party," i.e., a court. (*Id.* at p. 107.)

Since the payor-father clearly never really had physical custody of either daughter, the *McCann* opinion had no occasion to consider any request for credit, and, in fact, it is pretty obvious from the facts that the father never provided the sort of in-the-home support which precipitated the *Jackson* cases. While the *McCann* court cited *Jackson*, it was only for the negative implication that "assumption of custody does not automatically terminate a support order." (*McCann, supra*, 27 Cal.App.4th at p. 107.)

But it is critical to understanding the application of *McCann* to realize that the father-payor never really assumed *physical* custody in any way. As this court has observed, "While custody can have a specialized meaning under the Family Law Act [citation omitted] it is not the ordinary meaning of the word. The ordinary meaning of 'custody' in the context of a child of divorced parents is *physical* custody – the parent with whom the child actually lives." (*Inter Valley Health Plan v. Blue Cross/Blue Shield* (1993) 16 Cal.App.4th 60, 69.) And clearly neither *McCann* nor *Gregory* involved the payor parent living with the children or providing in-kind support because they shared the same household that is the ordinary meaning of custody under *Inter Valley*. And so, by the same token, neither case had occasion to confront the equities of enforcing an order

9

against a parent who had *discharged, fully or partially,* a child support obligation by providing support in the home in which the children lived.  That said, both cases do stand for the proposition of the continuing formal *existence* of a child support order if the payor parent does not take steps to formally modify or terminate it.

C. *The Davis and Wilson-Bodine Reconciliation Cases*

And finally there are the reconciliation cases.  As early as 1968, our Supreme Court had occasion, in *Davis v. Davis* (1968) 68 Cal.2d 290, to consider the effect of a marital reconciliation – reconciliation to the point of an actual *remarriage* to each other – on an existing child support order.  The essential sequence in *Davis* was: marriage, divorce, child support order, then remarriage, second divorce.  In the context of the second divorce action the payee-mother sought payments for a 36-month period from the time of the remarriage to the second support order via a writ of execution based on the first support order.  (*Id*. at pp. 290-291.)  But the trial court ruled the remarriage terminated the first support order and our Supreme Court agreed.  It reasoned that the termination of the order on remarriage was "consistent with the objective of reestablishment of the family for the benefit of both the children and the parties."  (*Id*. at p. 293.)

Forty-four years after *Davis*, this court, in *In re Marriage of Wilson & Bodine* (2012) 207 Cal.App.4th 768, had occasion to apply *Davis* in a setting where the first support order was not the product of a marital dissolution action, but a paternity action.  A couple had a child born in 2001, the mother obtained a child support order in a paternity action in 2002, another child was born to them in 2003, they actually married in 2005, but they separated again in 2008.  The mother initiated a dissolution action in 2008, but by 2010, the local department of child support services was asserting a very large arrearage based on the original 2002 paternity support order.[7]  That arrearage included

---

[7]     Attorneys who once wondered what good it would do them to learn to diagram sentences may find those skills useful in understanding this line of cases.

10

the time during which the couple were married to each other and living together.  (*Id*. at pp. 770-771.)  The trial court determined not to follow *Davis* because the original order was not the product of a marriage but a paternity action, so the order continued even after the actual marriage of the parents.  (*Id* at p. 773.)  This court, however, reversed.  We concluded *Davis* did apply, and relied on a well-reasoned decision from the North Dakota Supreme Court, *Schaff v. Schaff* (N.D. 1989) 446 N.W.2d 28, 32, which had concluded "no distinction should be drawn between the effect marriage has on a paternity decree versus a divorce decree of child support."  (*Wilson & Bodine, supra*, 207 Cal.App.4th at p. 775, summarizing, but not quoting, *Schaff*.)  The *Schaff* court had pointed out that the marriage of parents of a child born out of wedlock necessarily nullifies the *separate* rights and responsibilities toward the child ascertained in a paternity action and replaces those separate rights with *joint* rights and responsibilities.  (*Wilson & Bodine, supra,* at pp. 776-777.)  The *Wilson & Bodine* court added that even though the marriage had terminated the earlier paternity support order, on remand the trial court still had to evaluate whether the payor-father actually satisfied his parental obligation in the period after the 2008 separation.  (*Id.* at p. 777.)  That certainly supports our analysis here.

D.  *Out-of-State Cases*

While the issue before us is a new one in California, it has come to the attention of more than two score state courts around the country, as reflected in an annotation in the American Law Reports.  (See ALR Annot., *Credit for Time Resided supra, Annotation,* 104 A.L.R.5th 605.)  If there is one general conclusion to be distilled from the ALR annotation, it is that the majority of out-of-state cases that have dealt with the question of credit for child support during periods of reconciliation have allowed it on

11

the basis of one rationale or another, *even* when those courts otherwise recognize a state rule against retroactive modification of child support. (See *id*. at pp. 614-615.)[8]

However, identifying the strands of rationales offered in these pro-credit cases is not always easy. We conclude the pro-credit cases may be sorted into one of three theories: (1) general equity or trial court discretion; (2) some sort of voiding, nullification or suspension of the legal effectiveness of the prior decree that took place upon cohabitation, or (3) equitable estoppel based on the payor parent's having in some way reasonably relied on the payee parent's representations or conduct.

General equity cases include *Child Support Enforcement Admin. v. Shehan* (2002) 148 Md.App. 550, 561-562 [father allowed on remand to show he discharged his support obligation during the period of cohabition, and was thus eligible for "support credits"] and *Dalton v. Dalton* (2000) 207 W.Va. 551, 559 ["Any monetary contribution made by the obligor former spouse to the obligee former spouse for the support of the obligee former spouse and/or the parties' child(ren) constitutes a credit toward the fulfillment of the obligor former spouse's court-ordered support obligations."].)

The cases that take the view cohabitation somehow voids or suspends the ongoing support order take a different tack. In substance, they say that cohabitation has the legal effect of depriving an ongoing child support order of legal force during such a

---

8     From the summary of the annotation: "Many courts, in considering claims for child support arrearages, have stated the rule that past due installments of child support cannot be retroactively cancelled or modified (§ 3[a]). *Many of these same courts go on, however, to allow credit against child support arrearages, either for time the parties spent living together after the entrance of a child support decree, or for the value of some or all of the expenses of the household paid by the noncustodial parent while the parties so cohabitated, expressing the view that credit may be allowed against arrearages, despite the rule against retroactive cancellation or modification* (§ 3[b]). A few courts have based such an award of credit on a theory of estoppel, holding that the custodial parent was estopped from collecting substantial amounts of past due child support as a result of having led the obligor spouse to believe that no child support would be sought for the time the parties lived together as a family (§ 3[c]). [¶] *By contrast, many courts have considered claims for child support arrearages for time the parties cohabited without mentioning a rule prohibiting retroactive modification of child support decrees. These courts have generally held that trial courts have the discretion to allow credit against child support arrearages for time the parties lived together* (§ 4[a]), particularly where the parties have specifically agreed to modify the noncustodial parent's child support obligation (§ 4[b]). *Some courts, while not specifically stating that courts have the discretion to allow credit against child support arrearages, have by their holdings necessarily implied such a rule* (§ 4[c])." (Italics added.)

12

period. A good example of this group is *Thomas v. Thomas* (Okla.Civ.App. 1976) 565 P.2d 722, 723-724, which noted that while there was no "ceremonial remarriage," the couple's cohabitation after divorce constituted a "common law marriage," which had the effect of nullifying the previous support decree from the divorce action.[9]

The estoppel cases find their bases in the inconsistency of the payee parent, in effect, accepting support from the payor parent in the context of maintaining a household and then turning around and seeking the same support by way of enforcing a formal order to pay money. As good an example of the estoppel rationale as we have found is *Ramsey v. Ramsey* (1993) 43 Ark.App. 91. After first reciting the general rule that a child support payment is a vested debt due the payee parent (*id*. at p. 95), the *Ramsey* court nevertheless affirmed a decision excusing past due child support based on equitable estoppel, emphasizing classic estoppel doctrines such as reasonable reliance and being misled to one's detriment (*id*. at pp. 97-98).

These pro-credit cases are relatively easy to dissect and classify. The "anti-credit" cases, however, present harder problems of legal taxonomy. Finding a "pure" anti-credit case – one where, like the trial court here, the court *categorically* precluded even the possibility of credit for the period of cohabitation – turns out to be quite difficult. Any number of cases that didn't allow credit, for example, explicitly recognized the *possibility* of credit, but concluded the payor parent had failed *factually* in the attempt to show actual support was provided to the children during the period of

---

9    Another example is *Dooley v. Dooley* (La.App. 1983) 443 So.2d 630, 631-632 ["We hold that custody in one spouse, the right to which depends upon a separation of the spouses, either de facto . . . or de jure . . . cannot exist when the parents have become reconciled and there is no longer separation either de facto or de jure."]

*Jackson v. Jackson* (1972) 14 N.C.App. 71, 74, can be also included in the voiding-nullifcation-suspension group based on its observation that "If, after the order of 2 January 1969, there was a reconciliation and the wife and two children resumed the family group and lived together with the defendant-husband, the necessity for the support payments for the two children ceased."

cohabitation.[10] But we have found only two that appear to have categorically ruled out any possibility of credit. Both arrived at the same conclusion: A child support order creates a vested debt to the payee parent, and any equitable credit is the substantive equivalent of an improper retroactive modification of child support.

The two cases are *Houser v. Houser* (S.D. 1995) 535 N.W.2d 882 and *Cummings v. Cummings* (La.App. 1985) 469 So.2d 17. In *Houser*, the trial court had actually allowed credit (it called it an abatement) on an estoppel theory because there was evidence the payee mother had "agreed" that any of the payor father's child support obligations "would be off-set by" his "expenditures on behalf of the children, especially transportation costs during visitations." (*Id*. at p. 883.) The state high court reversed, flat out saying the trial court had no "authority to modify the child support provisions of the parties' divorce decree by eliminating father's past due support obligations through recognition of his request for a set-off." (*Id*. at pp. 883, 886.)

*Cummings* likewise was a reversal of a judgment not affording the payee mother arrearages in the wake of a reconciliation. The court simply asserted that the arrearages were property rights vested in the mother, and therefore equity could not vary them. (*Cummings, supra*, 469 So.2d at p. 18 ["To the extent the trial court may have been acting equitably in reducing the amount of arrearages, we note equity will not

---

10    See *Childers v. Childers* (1977) 50 Ill.App.3d 177, 178 ["The trial court believed the petitioner, and we cannot conclude that the trial court erred in so doing."]; *Ross v. Ross* (Utah 1979) 592 P.2d 600, 604 ["It is clear, therefore, that plaintiff did not even support himself during this reconciliation period, and he should not receive credit for support not in fact made."]; *Scully v. Scully* (1983) 213 Neb. 857, 861-862 [rejecting father's estoppel theory on the factual basis he actually hadn't proved enough to show estoppel on the part of the payee mother]; *Moore v. Casey* (Ala.Civ.App. 1983) 439 So.2d 164, 166  [rejecting, based on substantial evidence, the idea that the payor father had entered into a common law marriage during several of the couple's sporadic reconciliations]. The most exotic example we have found of the cases that recognized a possibility of credit but rejected it in the case at hand is *Davis v. Davis* (1996) 220 Ga.App. 745. The *Davis* court recognized the possibility of equitable credit, but rejected it for the procedural reason that a garnishment proceeding, in that court's view, did not constitute an *equitable* proceeding. (See *id*. at p. 746 ["Although our Supreme Court has held that under unusual and exceptional circumstances equity considerations may dictate that the child support payor be given credit for expenditures made on the child's behalf, those cases would not apply here because the state court lacks equity jurisdiction."].) For what it's worth, the Georgia court *Davis* rationale directly conflicts with our own *Jackson* line (particularly the five earlier cases *Jackson* relied on), which considered the enforcement of *all* child support orders to be inherently matters of equity.

14

nullify or reduce accumulated child support because child support is a vested property right until the judgment is altered or amended by a subsequent judgment or is terminated by operation of law."].)

E. *Application*

Struggling through this thicket is largely a matter of process of elimination. We first dispense with two of the three pro-credit rationales as inconsistent with established California doctrine. The void-null-suspension theory is inconsistent with *Gregory-McCann*. If a support order survives the *death* of the payee spouse, it should certainly survive a period of cohabitation. (Accord, *In re Marriage of Tavares* (2007) 151 Cal.App.4th 620, 625 [support order survived mother's concealment of the children].) Moreover, the underpinning of the void-null-suspension theory is a one-for-one equivalency of cohabitation with marriage. That might work in a state that recognizes "common law" marriages (as shown in Oklahoma's *Thomas* case), but California does not. (See *Norman v. Norman* (1898) 121 Cal. 620, 627-629.)

We may also dispense with the estoppel theory. As both *Trainotti* and *Jackson* note, a parent's child support obligation runs to the child, not the payee parent. (See *Trainotti, supra*, 212 Cal.App.3d at p. 1075; *Jackson, supra*, 51 Cal.App.3d at pp. 366-376; see also *Williams v. Williams* (1970) 8 Cal.App.3d 636, 640, quoting *Estate of Goulart* (1963) 218 Cal.App.2d 260, 263 ["If it be considered a debt it is, in essence, a debt owing to the child since a father's duty to support his minor children is a continuing obligation 'during the minority of the children of the marriage.'"].) An estoppel rationale – at least to the degree it would actually *excuse* an *existing* support obligation spelled out in an ongoing order based on the conduct of the payee parent independent of the actual support provided the children – would have the effect of subordinating the children's interest to the representations or conduct of that payee parent.

15

Nor do we accept the main idea behind the categorical no-credit cases: that allowing credit effects an improper retroactive modification of support. The essential underpinning of this idea is that child support is a vested debt owed *to the payee parent* and accumulates automatically with time, independent of whether a parent discharges the duty of child support that exists anyway. But, like the estoppel cases, that analysis focuses on the payee parent and not the children who are the recipients of support. The main point of the *Gregory* and *McCann* cases is that the duty continues independent of the death of the payee parent because the focus should be on the actual support provided, not the mechanics of the order. (See also *Tavares, supra*, 151 Cal.App.4th at p. 625.)

Moreover, mechanical application of the no-retroactive-modification rule seems to us inconsistent with the entire *Jackson* line. "The trial court may determine that nothing is owed for child support amounts that accrued during the period the supported child was *living with the obligor parent*. This does not effect an improper 'retroactive modification' because the arrearages are *deemed satisfied* by the obligor's direct provision for the child's needs during the applicable period of time." (See Hogoboom et al., Cal. Practice Guide: Family Law (The Rutter Group 2014) ¶ 17.81.1, pp. 17-32.2 to 17.32.3.) In none of the cases of the *Jackson* line did the payor parent race to court immediately upon obtaining physical custody in order to formalize the new arrangements. But it made no difference. Each one of those payor parents was able to obtain a modification of the arrearage that was technically building up every month the payor parent did not send money to the payee parent.

And finally, we would point out that to apply the rule against retroactive modification to a case where a payor parent seeks credit for support *actually* provided is a misapplication of the obvious purpose of the rule against retroactive modification. The rule itself is predicated on the assumption of the physical separation of the parents with one parent not living in the same household as the children. In that context the rule

16

serves the salubrious purpose of protecting the expectations of both the payor and payee parent – each knows with certainty the money coming in and going out of its respective household. Ironically though, to apply the rule to a case where the payor parent lives with the child and helps maintain the household in which the child lives is to actually *subvert* expectations. It creates a post-hoc "gotcha" making the payor parent pay twice for the same support.

That leaves us with only one approach that seems to make sense. We conclude the equity approach – allowing credit for support actually given during a period of cohabitation – is the one that best accords with existing California case law and the statutory scheme. First, in terms of existing case law, trying to distinguish the *Jackson* line by saying those cases involved a *total* switch of custody while the case here only involves *shared* physical custody is simply inaccurate. And in either situation the ostensible payor parent is in a position to provide in-the-home support, as distinct from merely writing a check every month. In fact, one of the out-of-state pro-credit cases directly confronted the 100-percent-versus-50-percent issue, and implied – in our view correctly – that the main difference in the two scenarios is merely that it is more *obvious* to the trial court that the payor parent is providing actual support in the total switch situation. (See *Haygood v. Haygood* (Ala.Civ.App. 1991) 581 So.2d 870, 871.)[11]

As *Wilson & Bodine* clearly stated, a parent's child support obligation (see § 3900) exists independent of marital status. In that regard we would note one point that seems to have been otherwise neglected in the cases: It is the public policy of this state to assure minor children frequent and continuing contact with *both* parents after separation.

---

[11] Said the court on that page: "Although there have been several cases where this court has allowed credits for periods in which a father has supported the children, such instances have typically involved situations where the children have moved out of the mother's house and lived solely with the father. [Citations.] While we do not find the principle of law enunciated in these cases to be inapplicable in circumstances similar to those in the case at bar, *we would note that, when the children live solely with the father, it is more readily apparent to the trial court when the father has provided the primary support.*" (Italics added.)

17

(See § 3020, subd. (b).[12]) *Not* giving credit has the effect of discouraging attempts at reconciliations in which the living arrangements reunite the payor parent with the children. Taken to its logical conclusion, it means that a payor parent would be forced to bring an expensive legal proceeding as the entry fee to any attempt at reconciliation. And there is also the prospect that the payee parent will misconstrue the nature of the proceeding, which would have to occur at the very moment the parents were contemplating reconciliation. People generally don't like getting served with legal papers, particularly from someone with whom they are contemplating living under the same roof. In relationships that are psychologically fragile to begin with, forcing one side to run to court to effectuate a reconciliation is a rule that thwarts attempts of parents to reunite and provide children a single household.

This addresses two of the trial court's three rationales for categorically denying George eligibility for credit – the idea the *Jackson* line is confined to 100 percent switch-overs of custody and the idea George should have brought a formal OSC immediately upon moving back in with the children.

The third rationale articulated by the trial court was strictly statutory: section 3602, which addresses the topic of pendente lite reconciliations. The trial court thought section 3602 occupies the entire field on the topic of reconciliations and support orders. It felt there is no possibility of credit if the order or the reconciliation do not qualify as pendente lite.

But that is not what section 3602 says. The text of section 3602 is short: "Unless the order specifies otherwise, an order made pursuant to this chapter [which is solely concerned with pendente lite spousal or child support] is not enforceable during

---

[12]     Which provides: "The Legislature finds and declares that it is the public policy of this state to assure that children have frequent and continuing contact with both parents after the parents have separated or dissolved their marriage, or ended their relationship, and to encourage parents to share the rights and responsibilities of child rearing in order to effect this policy, except where the contact would not be in the best interest of the child, as provided in Section 3011."

18

any period in which the parties have reconciled and are living together." The key words are "not enforceable *during any period*." (Italics added.) The purpose of section 3602 is to foster reconciliation, a purpose which would be undercut by allowing enforcement proceedings during an attempted reconciliation. But there is no evident purpose to precluding equitable *credit* for actual support provided. Consider, for example, that the arrearages accumulated "during" a period of reconciliation and living together would still, a la *Gregory* and *McCann* – and by implication from the language of the statute – be "enforceable" if the reconciliation failed. Equitable credit merely allows a support order (including a pendente lite one) to be *fulfilled* by means other than a check written from payor parent to payee parent. *Not* to give credit would actually run counter to the purpose of the statute of fostering reconciliation, by creating a distinct disincentive on the payor's part to live together with the children and payee parent and provide in-the-home support during such a period.

We therefore conclude the trial court erred in ruling George was categorically ineligible for "*Jackson* credits." The case must be remanded to give the court the opportunity to consider George's request for them. And for the benefit of the court on remand, we provide one point of guidance.

The essence of the equitable credit approach is that in-the-home support during a period of living with the children can count against an ongoing support order that is framed only in monetary terms. (*Dalton, supra*, 207 W.Va. at p. 559; *Shehan, supra*, 148 Md.App. at pp. 561-562.) However, we must also point out that under the equitable credit approach, the payor spouse necessarily has the burden of showing the provision of actual in-kind or in-the-home support. That point was made by the *Jackson* court itself when it quoted *Lohman, supra,* 29 Cal.2d at page 150, for the proposition that while execution of a judgment may be "'denied upon equitable grounds," the "'burden is cast upon the judgment debtor to establish facts justifying an order denying the writ.'" (*Jackson, supra*, 51 Cal.App.3d at p. 367.)

19

Along that line, the trial court's determination that George did not merit credit for his payment of rent to Allyson's father when he moved in with the children was a correct one. The key fact is that Allyson hadn't been paying any rent previously. So George's payment could hardly be said to be the provision of a roof over the head of the children. It appears to have been a charge for his own roof imposed by the father of his girlfriend.

In the interests of justice each party will bear its costs on appeal.


BEDSWORTH, ACTING P. J.

WE CONCUR:


MOORE, J.


ARONSON, J.

20