Filed 5/16/16 (unmodified opinion attached) mod. received 5/20/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Conservatorship of the Person and Estate of DAVID BOWER. | |
| ANDREA BOWER, as Conservator, etc., Petitioner and Respondent, v. LYNN BOWER, Objector and Appellant; DAVID BOWER, Objector and Respondent. | G050468 (Super. Ct. No. 30-2011-00471248) ORDER MODIFYING OPINION |

It is ordered that the opinion filed herein on April 15, 2016, be modified in the following particulars:

1. On page 2, after the heading "I. INTRODUCTION" add the following paragraph:

"In 1800, Lord William Thompson Kelvin – the great scientist who first conceived the temperature scale that now carries his name – lamented that, "There is nothing new to discover in physics now. All that remains is more and more precise measurement." Today, in the 144th year of the Field Codes, we wrestle with an issue of first impression. Law students, take note: there is plenty left to be discovered."

2. On page 3, first partial paragraph, last sentence, change the word "irritated" to "concerned."

3. On page 3, second paragraph of the facts, first sentence, change "David was diagnosed" to "he was diagnosed".

4. On page 6, second full paragraph, first sentence, change "be temporary" to "serve as temporary".

5. On page 6, third full paragraph, first sentence, change "year and nine" to "21".

6. On page 20, first partial paragraph, the sentence that reads "And again a vicious cycle . . .", change "cycle" to "circle".

7. On page 20, last partial paragraph, in the sentence that begins "But it is clear . . ." add "exercise of" between "its" and "discretion".

8. On page 20, last partial paragraph, delete the phrase "cared about" and replace with "focused on".

9. On page 20, last partial paragraph, in the sentence that begins "What the court cared about . . ." delete the phrase ", to once again allude to the Sinatra song, that Lynn hadn't done it the court's way." and replace it with "that Lynn had not followed its directions."

10. On page 21, in the first full sentence that begins "Under section 3089," delete the phrase "that focus has to be on" and replace with "the question should have been".

This modification does not effect a change in the judgment.



BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


THOMPSON, J.

Filed 4/15/16 Certified for Publication 5/16/16 (order attached) (unmodified opinion)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Conservatorship of the Person and Estate of DAVID BOWER. | |
| ANDREA BOWER, as Conservator, etc., <br><br> Petitioner and Respondent, <br><br> v. <br><br> LYNN BOWER, <br><br> Objector and Appellant; <br><br> DAVID BOWER, <br><br> Objector and Respondent. | G050468 <br><br> (Super. Ct. No. 30-2011-00471248) <br><br> O P I N I O N |

Appeal from an order of the Superior Court of Orange County, Randall J. Sherman, Judge. Reversed and remanded with directions.

Best Best & Krieger; Lewis Brisbois Bisgaard & Smith and Kira L. Klatchko for Objector and Appellant.

Law Office of John J. Brunelli and John J. Brunelli; Snell & Wilmer, Richard A. Derevan, Todd E. Lundell, for Objector and Appellant.

Deily, Roehl & Glowacki and John P. Deily for Objector and Respondent.

# I. INTRODUCTION

Probate Code section 3089 gives authority to probate courts to divide a married couple's community property, even when there is no divorce, if one spouse has a conservator and the remaining competent spouse refuses to "comply" with an order made under article 3 of part 6 of division 4 the Probate Code.[1]  This case turns on what the Legislature meant by an order under article 3.  As we show below, article 3 provides for orders for the support and maintenance of a conservatee spouse.  But it does not provide for conservatorship or attorney fee orders.  Those matters are the subject of a different part of the Probate Code altogether, and entail a set of safeguards and protections that simply don't mesh with the family-law style periodic payment of support orders generally contemplated under article 3.

The probate judge here equated fees for attorneys and conservators with support and maintenance.  In essence he confused the support of a conservator*ship* with the support of the conserva*tee*.  We understand the impulse behind the trial judge's thinking.  From an institutional point of view, probate judges are concerned on a regular basis with fee claims by attorneys and conservators, and courts necessarily look to a conservatee's estate as a source of payment for those claims.  By dividing the property, the probate judge made the administration of the conservatorship easier.  But article 3 is concerned with orders for the support and maintenance of the conservatee spouse, not with expediting professional fee claims.  Professionals can collect their fees pursuant to court orders independently of article 3.

In this case the competent spouse, Lynn Bower (Lynn) unquestionably paid for the support and maintenance of her conservatee husband David.  In fact she devoted about 72 percent of the couple's $200,000 marital estate income to making the $12,000 a month payments to a home specializing in Alzheimer's care for David.  What she didn't

---

[1]     All undesignated statutory references in this opinion are to the Probate Code.  All references to "article 3" are to article 3, part 6, division 4 of the Probate Code.

2

do was comply with the letter of an order of the probate court to pay lump sum large professional fee claims *directly* to David's conservator and several other creditors. Instead she either paid those claims directly herself, or those claims were paid indirectly from escrows based on liens asserted by the relevant professionals. The probate judge was irritated that Lynn had acted, as he put it, like "Frank Sinatra, she gets to do it her way."

Based on the literal noncompliance with the terms of the order, the probate judge ordered the community estate of the Bowers divided, with the conservator receiving David's share. Because the probate court erroneously proceeded on the premise that section 3089 is triggered by noncompliance with orders to pay professional fees directly to the conservator in a lump sum, rather than refusal to comply with an order to support the conservatee spouse under article 3, we must reverse the order dividing the estate and remand the matter to the trial level for application of the proper standard to the facts at hand.

## II. FACTS

Lynn and David were married in 1983. During their marriage they acquired no less than 30 separate parcels[2] of real property, including a family home in Anaheim Hills. Essentially, they each worked as full time landlords managing their small real estate empire.

Sometime around 2007, when David would have been about 51 years old (and Lynn about 47), David was diagnosed with frontotemporal dementia, otherwise called FTD.[3] Frontotemporal dementia is a term that describes a group of mental disorders affecting both an individual's memory *and* personality. Often the afflicted person will begin to act out of character. (See Streisand & Spar, *A Lawyer's Guide to*

---

[2] The order dividing the community estate lists 34 items of real property. However, the order notes that at one deposition Lynn testified the couple owned 50 properties.

[3] Lynn would later testify that David showed "symptoms" of the disease as early as 2005.

3

*Diminishing Capacity and Effective Use of Medical Experts in Contemporaneous and Retrospective Evaluations* (2008) 33 ACTEC J. 180, 188.) In David's case, his dementia appears to have precipitated a craving for alcohol and a hostility toward his family (his wife Lynn and their three young adult children). While FTD is sometimes described as a fatal disease (see *In re Guardianship & Conservatorship of Roberts* (Minn. Ct. App., Dec. 24, 2012, A12-0701) [2012 Minn.App. Unpub. LEXIS 1223]) we should note here the record does not indicate David's disease is terminal. In November 2013, for example, Lynn submitted a declaration to the court stating that the latest research on FTD patients suggests a life expectancy between 3 and 17 years.

The record *does* show David's condition has been more specifically classified as "semantic" dementia, which impairs parts of the brain affecting language. While David appears to have lost the ability to articulate words, or read or write, there is some indication in the record he can communicate his thoughts and feelings through gestures, like a thumbs up sign for yes or crossing his arms over his chest for no. Whether or not his thoughts and feelings are *themselves* the product of his dementia appears to be an open question.

Beginning in 2007, Lynn began to manage the couple's real property empire alone. During this period, David began more and more to perceive his wife Lynn and his children as his enemies. He wasn't exactly banished, like Rochester's wife in Jane Eyre, to an attic, but – apparently, at Lynn's direction – he did begin living in a cottage in back of the family home.

Perhaps because of this estrangement from his family, in June 2009, David signed a power of attorney form giving his sister Andrea control over all his financial matters. A little more than a year later, in September 2010, Andrea caused David to file a

4

petition for dissolution of his marriage to Lynn.[4]  But the proceeding went nowhere.  In March 2011, at Lynn's behest, the family law court dismissed the dissolution action, finding that David lacked the "necessary mental capacity to form or express his independent resolve, free of any undue influence, to legally dissolve his long term marriage based on irreconcilable differences."  The family law judge continued:  "The evidence is overwhelming that David lacks the requisite mental capacity to maintain these proceedings and any evidence to the contrary is characterized as de minimis, if any at all."

As if to confirm the family court's characterization of David's lack of capacity, the day after the family law judge dismissed the dissolution action there was an incident in the family home that prompted his temporary hospitalization under section 5150 of the Civil Code.  A gun was visible on a counter and David made "shooting motions" toward Lynn and his daughter Rachel.  The incident prompted Lynn to call the police, who took David to the "psych ward" at UCI Medical Center.  (David's inability to speak would have, if anything, made the gesture more objectively frightening since it could have conveyed more than just ineffable antipathy.)

David was soon transferred, at Lynn's direction, from the UCI center to a facility called Silverado.  Andrea, however, objected to Silverado, and took David from Silverado to her own home in Escondido.  There he developed a habit of breaking into neighbors' houses to take beer from their refrigerators.

In mid-April 2011, on the heels of the family law court's dismissal of the dissolution petition, Andrea filed this action to have herself appointed as a conservator for David.  Andrea was appointed temporary conservator of David's person in May 2011, and also appointed temporary conservator of his estate in December of the same year.

---

[4]  We take judicial notice of the petition filed in *In re Marriage of Bower*, Orange County Superior Court case No. 10D008475.  Because of the later finding by the family law court that David had been incapable of making the decision to file for dissolution himself we say Andrea "caused" him to file the petition rather than "David filed the petition."

Being temporary conservator of his person allowed Andrea, in July 2011, to place David in a Costa Mesa facility known as Autumn Years that was oriented to Alzheimer's patients. In addition to the temporary conservator, the court also appointed an attorney to independently represent David.

The placement in Autumn Years would prove a bone of contention between Lynn and Andrea. Lynn thought the move was "inappropriate" since David had been doing well in Silverado, and she didn't think the Autumn Years facility equipped to care for him. Moreover, because David escaped from Autumn Years soon after his placement, Andrea agreed to the added expense of a one-on-one companion. In her opposition to Andrea's petition, Lynn asserted the Autumn Years facility was billing for 32 hour days.

In January 2012, Andrea and Lynn agreed in a stipulated court order, as an interim resolution of Andrea's petition, to have two professional conservators, Lee Ann and Bruce Hitchman, be temporary conservators of both David's person and estate, but without power over any community assets. Lynn also agreed to pay all of David's outstanding medical, pharmaceutical, doctor and residential care bills,[5] and further pay all "ongoing charges and expenses relating to the care, treatment and placement of David" going forward.

But Lynn did not pay all the bills which the Hitchmans thought should be paid – at least not for another year and nine months or so. The unpaid bills that had accumulated by the summer of 2012 included claims submitted by six separate sets of caregivers totaling around $36,000,[6] plus Andrea's own claim for about $22,000 for money she had put out for his care, plus for a temporary conservator's bond fee. That month the Hitchmans filed a petition under section 3080 to require Lynn to use community property to pay them.

_____

[5] Though charges for one-on-one care predating January 17, 2012, were excluded.

[6] Two were individuals who had advanced a total of $5,000 for care, two were institutional (for about $31,000 total), one was an institutional overtime bill (about $100), and one was to David's attorney for advances for a medical assessment.

By late September 2012, several other matters had accumulated in the court's inventory in addition to the Hitchmans' petition. Andrea's original petition to have herself appointed David's permanent conservator was still outstanding. David's son Warren had just filed a petition proposing to have himself appointed David's conservator. On top of that, Andrea – no longer temporary conservator but now acting in her role as an interested party – filed a section 3080 petition similar to the Hitchmans' to enforce support of David from the community estate.

The trial court responded in a proactive minute order filed in late September, consolidating the various matters and setting them for trial on November 5 – the date the Hitchmans' temporary conservatorship was set to expire. The court proposed to proceed in a logical fashion: First the court would decide whether a permanent conservatorship was necessary at all. If so, it would then decide which of two candidates who had come forward for the post of permanent conservator – Andrea or Warren – should be appointed. (By that time Lynn had thrown her support behind Warren, essentially dropping out of the race for conservator.) Finally, it would decide the Hitchmans' section 3080 petition, or any other like petition (such as Andrea's as interested party) that might be filed prior to November.

Preparatory to the November 2012 trial, a probate court investigator interviewed David, who communicated by either holding up one finger, or giving the thumbs up gesture, to say yes, or by holding up two fingers or crossing his arms over his chest to say no. While the investigator felt that it was "difficult to assess" David's comprehension, to the degree that David *was* able to make his feelings known, David indicated he was opposed to any conservatorship at all. But if one was going to be imposed anyway, David wanted Andrea appointed – and indicated so three times. He also signaled he didn't want either Lynn or Warren as his conservator.

The November trial resulted in the appointment of Andrea as conservator, largely as the result of David's indicated preference. While the court found David

7

needed a conservator, it also found he was sufficiently mentally competent to intelligently express a desire as to who that conservator should be.[7]  Moreover, thought the court, there was no reason to favor Warren over Andrea as conservator, given how "adamant" David had been in expressing his wishes against Warren to the court investigator.

Still, the matters of unpaid bills claimed by the Hitchmans and the management of the conservatorship estate's assets remained outstanding.  The court set late February 2013 to hear those matters, though they would ultimately be continued to May 2013.  What was accomplished at the February hearing was a stipulation that Lynn would pay $12,000 in a month in temporary support to Andrea as the new conservator (to cover the Autumn Years bills), plus pay another $10,000 to her as a lump sum.

The question of the previous unpaid bills was finally litigated at the May 2013 trial.  With attorney fee and conservator fee claims being added to the previously unpaid amounts, the probate court found the existence of about $340,902.92 in unpaid debts and claims against the conservatorship.  Eighty percent of the $340,902.92 (about $275,000) was for conservatorship fees or attorney fees, related to professional fees incurred in the administration of the the conservatorship and the litigation.[8]

---

[7]     One of the tragedies of mental incapacitation is that it makes ascertainment of an individual's true wishes difficult.  A man, not in his "right mind" as King Lear described himself, might think his most loyal daughter churlish for not embellishing her praise of him, then turn around and give his estate to two scheming daughters who falsely flatter him – only to realize, in the end, he got things exactly wrong.
      In the case before us, the difficulty manifests itself in the tension between the two existing trial court assessments of David's competency.  The family court concluded that David was not competent enough even to have a preference as to whether he wanted to remain married to Lynn or not.  (But see *In re Marriage of Greenway* (2013) 217 Cal.App.4th 628, 652-653 [though husband had mild dementia, his sworn petition alleging irreconcilable differences, plus repeated requests for trial preference, and declarations attesting to fact marriage was "bad" for last 30 years were held sufficient to find irreconcilable differences].)  But the probate court concluded that David was competent enough not to want Lynn or his son as conservator.  Since Lynn has not challenged the probate court's decision to make Andrea David's permanent conservator, we do not have occasion in this case to try to reconcile these seemingly opposed factual findings at the trial level.  (Cf.  § 1810 [a person with "sufficient capacity . . . to form an intelligent preference" may nominate his or her own conservator].)

[8]     The figure comprised:
          (1)  Unpaid claims by Andrea, $26,991.90;
          (2)  Independent counsel for David, $139,247.98;
          (3)  Attentive Home Care, $28,023.94;
          (4)  David Williams $11,207.07;

8

But the court was also clear at the May 2013 trial it would not order the community assets divided *then*.  Andrea had argued that Lynn had essentially starved the conservatorship of operating funds.[9]  Accordingly, the court ordered Lynn to pay *directly* to Andrea all $340,902.92.  The court expressly deferred the question of splitting up the community property until a hearing on November 14, 2013, an action it would later characterize as a "second chance" for Lynn.  At that hearing, said the court, the question would be whether "Lynn Bower refused to comply with an order to provide support for the conservatee."[10]

Paying all $340,902.92 directly to Andrea was, practically speaking, impossible.  To obtain such a large sum, over the next several months Lynn liquidated $536,000 worth of property, resulting in a net receipt of about $432,000 for the marital estate.  However, $275,000 of that was "intercepted" via escrow payments of judgment liens filed by the various conservators and attorneys who had appeared in the matter and whose claims were obviously components of the $340,902.92.

The matter was actually heard in December, and Lynn sought credit as against the $340,902.92 for amounts *she* had paid to various parties or which had been intercepted in escrow.  According to her declaration, Lynn paid Andrea $21,804.15,

(5)  George Adams $8,873.98;
(6)  The Hitchmans, $30,314.00;
(7)  Counsel for the Hitchmans, $$46,999.95;
(8)  Former counsel for Andrea, $49,244.50.
We note that part of Andrea's claim was for a bond as temporary conservator, as distinct from David's own living expenses.

9       As Andrea's counsel argued, "The problem that we have right in this interim period is we have a conservator of the estate with no money whatsoever . . . ."  For example, Andrea's counsel told the court that she had advanced around $14,000 for "residential care" but Lynn had not paid the bill.

For her part, Lynn argued that, strictly speaking, there was no community property at all because of the way properties in the estate were held, i.e., in trust.  This argument did not persuade the probate court and Lynn has the good sense not to press it on appeal.  (See *In re Marriage of Perry* (1997) 58 Cal.App.4th 1104, 1109 [just because property is held in living trust does not mean it still isn't subject to child support claims].)

10       That's giving Lynn the benefit of a possible ambiguity in the minute order of May 17, 2013.  At a later hearing in December of 2013, Lynn's counsel argued that the court hadn't found, *back in May*, that Lynn had violated any previous court orders.  The trial judge disagreed.  As far as the court was concerned, Lynn had *already* violated a previous order.

Attentive Home Care $25,147.69, David Williams $7,670.31 and George Adams $3,873.98.

Andrea controverted Lynn's declaration. Andrea averred she had only received the $12,000 monthly payments for David's upkeep at Autumn Years, disputing that Lynn had paid any part of the $21,804.12, much less the $26,999.90 contemplated in the May order.[11] Andrea added that Attentive Home Care's payment had been "arbitrarily reduced," and it was still seeking the balance (Andrea had been emailed by Attentive Home Care about the unpaid balance). She further declared David Williams had been paid less than the amounts owed, and George Adams was paid "nothing at all."

There was also a matter of some $63,000 which Lynn had paid her attorney to put into a trust account. The attorney told the court she had given him the money to disburse directly to creditors of the conservatorship, as distinct from paying the conservator directly. The attorney said his hands were tied – his client had directed him about money in his trust account. When the trial judge heard that, his rejoinder was: "I can appreciate that, which makes it easy for the court to find that your client committed the required refusal under Probate Code section 3089 to comply with *a* court order." (Italics added.[12]) The judge elaborated: "I essentially gave her a second chance and she blew it."

Lynn's counsel's defense was to distinguish between "support" and accumulated attorney fees. He argued that of the $340,000 required, about $275,000 was for fees, not "support." The trial judge disagreed, pointing out that if caregivers do not

---

[11] This case gets more complicated as one goes along: On appeal, Lynn asks this court to take judicial notice of *post-appeal* documents filed by Andrea which indicate that Andrea really was mistaken in not acknowledging payment by Lynn to Andrea. If we were affirming we might easily say to Lynn: "Tough, your trial attorney simply didn't do a good job at the December 2013 hearing in demonstrating that you did pay Andrea the amounts required by the May 2013 order, you can't cure that failure by using post-appeal documents; your remedy, if any, is by way of a malpractice action." But since we are reversing because the probate court used the wrong legal standard, we deny the request as moot, since Lynn will get a do-over on remand.

[12] We will address the significance of that italicized article "a" when we discuss the proper trigger for section 3089 in part III below.

10

receive amounts owed that are past due, it affects future care. But more basically, the court flatly characterized all $340,000 – including attorney fees – as *itself* entirely for the "support" of the conservatee. The court then set a date in March 2014 for the division of the community assets. Lynn timely appealed from the subsequent order of division.

### III. DISCUSSION

A. *The 3089 Issue*

Section 3089 presents a textbook case of how standards of review can interact.[13] First, there is a question of language: Precisely what is meant by the phrase "to comply with any order made under this article?" Such questions are a matter of de novo review because the interpretation of language is the particular province of the courts. (E.g., *Redevelopment Agency v. County of Los Angeles* (1999) 75 Cal.App.4th 68, 74.)

Then, after ascertainment of what is meant by "order made under this article" comes a question of substantial evidence: Did the competent spouse with control over the community property refuse to comply with such an order, the contours of which we defined in the de novo review?

And finally, after de novo and substantial evidence, we come to a matter tested under the deferential abuse of discretion standard. Assuming there was substantial evidence the competent spouse did indeed refuse to comply with an "order made under

---

[13]    Section 3089 provides in its entirety: "If the spouse who has the management or control of the community property refuses to comply with any order made under this article or an order made in a separate action to provide support for the conservatee spouse, upon request of the petitioner or other interested person, the court may, in its discretion, divide the community property and the quasi-community property of the spouses, as it exists at the time of division, equally in the same manner as where a marriage is dissolved. If the property is so divided, the property awarded to each spouse is the separate property of that spouse and the court shall order that the property awarded to the conservatee spouse be transferred or paid over to the conservator of the estate of that spouse to be included in the conservatorship estate and be managed, controlled, and disposed of as a part of the conservatorship estate. The fact that property has been divided pursuant to this section has no effect on the nature of property thereafter acquired by the spouses, and the determination whether the thereafter-acquired property is community or separate property shall be made without regard to the fact that property has been divided pursuant to this section."

this article," was the trial court's discretionary decision to divide or not divide the community property a reasonable decision?

But there's a further wrinkle to such tripartite level review: a feedback loop. Suppose the probate court proceeds on the erroneous assumption that the scope of section 3089 is much broader than it really is. Trial judges who misapprehend the scope of their authority under section 3089 may be more inclined to exercise their discretion in favor of division rather than against it. Case law is clear, however, that getting the legal standard wrong means that a subsequent decision becomes *itself* a per se abuse of discretion even if, assuming the wrong standard, the decision is otherwise reasonable. (See *City of Sacramento v. Drew* (1989) 207 Cal.App.3d 1287, 1298 [noting that "if the trial court acts in accord with its mistaken view the action is nonetheless error; it is wrong on the law]"]; *Flannery v. California Highway Patrol* (1998) 61 Cal.App.4th 629, 634 ["reversal is required where there is no reasonable basis for the ruling or when the trial court has applied the wrong test to determine if the statutory requirements were satisfied"]; *Nichols v. City of Taft* (2007) 155 Cal.App.4th 1233, 1239 [quoting wrong test language from *Flannery*].)

One of the best explanations for this feedback loop is given in *Horsford v. Board of Trustees of California State University* (2005) 132 Cal.App.4th 359, 394. There the court pointed out that a decision made under the wrong standard might very well be reasonable within its own frame of reference, but would still be an abuse of discretion because it would still contravene the specific law that grants the discretion in the first place. And that, we reluctantly conclude, is exactly the case before us.

B. *The Meaning of "Order Made Under This Article."*

We are sympathetic with a probate judge who would instinctively equate the support and maintenance of a conservator*ship* with the support and maintenance of a conserva*tee*. Given the day-to-day administration of conservatorships, there is an

12

obvious need to expedite professional fee payments, and one way to do it is to divide up community property under section 3089 so as to free up property for those payments.

However, the text and structure of the statute, plus the legislative history behind it, point to a narrower meaning that focuses only on those items traditionally seen as support. The "article" referred to in section 3089 is article 3 of part 6 of division 4 of the Probate Code, significantly referenced in section 1103 of the Family Code. The Family Code provision basically says that if one spouse has a conservator, then management and control of the couple's community property is as provided in part 6 of division 4 of the Probate Code.[14] We should note here the Family Code formula encompasses more than article 3 of the Probate Code. Thus under the Family Code, as provide in section 3051 of the Probate Code (which is a part of article 2, not article 3), if a conservatorship is established for a married person, the remaining spouse retains full management and control of the community property. (See § 3051, subd. (b)(1).)

Article 3 consists of 13 sections. Of those, nine are procedural.[15] Of the balance, the initiating statute is section 3080, which sets up the scenario of a competent spouse and a conservatee spouse, where either the conservator or "any interested person" can file a petition to require the competent spouse to apply the community property

---

[14] Family Code section 1103, subdivision (a) provides: "Where one or both of the spouses either has a conservator of the estate or lacks legal capacity to manage and control community property, the procedure for management and control (which includes disposition) of the community property is that prescribed in Part 6 (commencing with Section 3000) of Division 4 of the Probate Code."

[15] Sections 3081, providing for notice; 3082, allowing the court to require the controlling spouse's presence before the probate court and his or her divulgence of information about the community property; 3084, requiring the controlling spouse to file income and expense and current property declarations; 3085, providing for ex parte restraining orders to prevent the controlling spouse from disposing of community property except in the usual course of business; 3086, allowing for the petitioner in an article 3 proceeding to obtain continuances to obtain discovery; 3087, which gives the probate court the authority to characterize property as community or not; 3090, providing for various forms of enforcement including contempt or appointment of a receiver; 3091 giving the Judicial Council rule making authority to set out the practice and procedure of the article; and 3092, making clear that the article does not preclude other actions to enforce support.

(either income or principal or both) for the "support and maintenance of the conservatee as ordered by the court."[16]

---

[16]    Section 3080 provides in its entirety:  "If one spouse has a conservator and the other spouse has the management or control of community property, the conservator or conservatee, a relative or friend of the conservatee, or any interested person may file a petition under this article in the court in which the conservatorship proceeding is pending for an order requiring the spouse who has the management or control of community property to apply the income or principal, or both, of the community property *to the support and maintenance of the conservatee as ordered by the court*."  (Italics added.)

Section 3088 provides a gloss on section 3080's phrase, "support and maintenance." Section 3088 begins, perhaps a bit jarringly, with the seemingly particularized statement that community property can be used for the support of a spouse who is being cared for in a state mental hospital.[17] But there appears to be a reason for such a narrow beginning: When the statute was enacted in 1980, claims by state mental hospitals for the support of conservatee spouses constituted a more common situation. (See *Guardianship of Thrasher* (1951) 105 Cal.App.2d 768 (*Thrasher*)[18]) when there was relatively greater use of state mental hospitals to care for such spouses.[19]) The statute then moves on to a list of factors to be used by the probate court in establishing an order for support and maintenance of a conservatee spouse, and those factors are a short version of the factors given in section 4320 of the Family Code to determine spousal support.[20] And, similar to traditional spousal support in family law cases, section 3088 envisions support being paid in periodic payments.[21]

---

[17] Subdivision (a) of section 3088 provides: "The court may order the spouse who has the management or control of community property to apply the income or principal, or both, of the community property to the support and maintenance of the conservatee, including care, treatment, and support of a conservatee who is a patient in a state hospital under the jurisdiction of the State Department of State Hospitals or the State Department of Developmental Services, as ordered by the court."

[18] *Thrasher*, in fact, was considered by the California Law Revision Commission in revising California's laws involving conservatorships in 1980 in the context of the traditional spousal duties of mutual support. (See Recommendation of the California Law Revision Commission relating to the Revision of the Guardianship-Conservatorship Law (hereinafter 1980 Commission Report) at p. 1469, fn. 8.)

We grant Lynn's motion on appeal to take judicial notice of portions of the legislative history of Assembly Bill No. 132 (Stats. 1981, ch. 9). which includes the 1980 Commission Report.

[19] See Boldt, *Perspectives on Outpatient Commitment* (Fall 2014) 49 New Eng. L. Rev. 39, 42-51 [generally discussing the general deinstitutionalization movement in the period after 1950].)

[20] Subdivision (b) of section 3088 provides:

"In determining the amount ordered for support and maintenance, the court shall consider the following circumstances of the spouses:

"(1) The earning capacity and needs of each spouse.
"(2) The obligations and assets, including the separate property, of each spouse.
"(3) The duration of the marriage.
"(4) The age and health of the spouses.
"(5) The standard of living of the spouses.
"(6) Any other relevant factors which it considers just and equitable."

[21] Subdivisions (d) and (e) of section 3088 provide:

There is nothing in article 3 that suggests conservator or attorney fees are encompassed within the meaning of "support and maintenance." Fees are not mentioned at all. (See Welf. & Inst. Code, § 914 [defining "support and maintenance" in terms of reasonable value of bed and board in certain state-run institutions].) Where fees are mentioned elsewhere in the Probate Code, they are mentioned in a context incompatible with support and maintenance as the phrase is used in section 3080. Both attorney and conservatorship fees are the province of sections 2640 through 2647 of the Probate Code. Those statutes constitute an important bulwark against elder abuse in California, by protecting persons who need conservatorships from exploitation by professionals who treat their estates as blank checks. (See *Estate of Moore* (2015) 240 Cal.App.4th 1101, 1107 [attorney for demented person charged excessive fees and expenses and was properly surcharged for those bills by probate court who opined that attorney had possibly committed "elder abuse"].)

And if those statutes are clear about anything, they are clear that neither conservatorship nor attorney fees are to be paid automatically, or as a matter of course, but must *always* be first approved by the court after a noticed hearing. (See §§ 2640 [noticed hearing]; 2642 [noticed hearing]; 2643 [power to cut excessive or unreasonable fees]; 2643.1 [requirement services be actually rendered]; 2645 [court must approve fees

---

"(d) The court may order the spouse who has the management or control of community property to make a specified monthly or other periodic payment to the conservator of the person of the conservatee or to any other person designated in the order. The court may order the spouse required to make the periodic payments to give reasonable security therefor.

"(e)(1) The court may order the spouse required to make the periodic payments to assign, to the person designated in the order to receive the payments, that portion of the earnings of the spouse due or to be due in the future as will be sufficient to pay the amount ordered by the court for the support and maintenance of the conservatee. The order operates as an assignment and is binding upon any existing or future employer upon whom a copy of the order is served. The order shall be in the form of an earnings assignment order for support prescribed by the Judicial Council for use in family law proceedings. The employer may deduct the sum of one dollar and fifty cents ($1.50) for each payment made pursuant to the order. Any such assignment made pursuant to court order shall have priority as against any execution or other assignment unless otherwise ordered by the court or unless the other assignment is made pursuant to Chapter 8 (commencing with Section 5200) of Part 5 of Division 9 of the Family Code. No employer shall use any assignment authorized by this subdivision as grounds for the dismissal of that employee."

and must be to advantage of conservatee].)  In fact, section 4647 is extremely clear that such professional fees should affirmatively *not* be paid without a prior court order.

Further, article 3 takes as its model traditional family law support and maintenance (cf. § 3088), and such support and maintenance is understood in family law as a distinctly different issue from attorney fees.  (See Hogoboom et al., Cal. Practice Guide:  Family Law (The Rutter Group 2016) ¶ 11:552 [advising lawyers to treat separate issues separately, and noting spousal support and attorney fees and costs are separate issues].)  Support, after all, is an end in itself; attorney fees are merely a means to an end.  (Compare *In re Marriage of Benjamins* (1994) 26 Cal.App.4th 423, 430-431 [noting support typically includes things like housing, feeding, clothing, health, proper recreation, vacation, traveling expenses, proper care, nursing, and medical attendance in sickness] with *Alan S. v. Superior Court* (2009) 172 Cal.App.4th 238, 252 [the point of attorney fee awards in family law proceedings is to assure a fair hearing with two sides equally represented].)

Our conclusion is confirmed by the legislative history of article 3.  The article was the product of the 1980 Commission Report).  Once again the year is significant.   The 1980 Commission Report came out only five years after the management and control of community property was changed from a presumption the husband would have that management and control to joint control by both spouses.[22] (See *In re Marriage of Alexander* (1989) 212 Cal.App.3d 677, 682 [discussing this history].)  Thus, the 1980 Commission Report rejected the idea of simply making community property a part of the conservatorship estate, because it would "deprive the competent spouse of the right of equal management and control."  (1980 Com. Report at p. 1472.)  But, on the other hand, since the competent spouse would still have the traditional spousal duty of support, there was a need for a "summary proceeding" so as to

---

[22]     Yes, California statutory law contained an overt discrimination against women that far into the 20th Century.

17

make community property available for such support. (*Id*. at p. 1470 [recommending "summary procedure that will permit the conservator or other interested person to obtain an order requiring the competent spouse to apply the community property income or principal or both to the support of the conservatee spouse"].) The result was section 3080 which provides for support and maintenance orders against the remaining competent spouse without dividing the community property.

Sometimes lacuna are important. We have not found in the legislative history of article 3 is any indication the Legislature wanted to allow community property to be divided sans divorce in order to pay the professional fees attendant on conservatorships. Nor has able counsel representing the conservatorship cited us to any such indication.

Andrea posits that the word "maintenance" (as in "support and maintenance") is enough to encompass orders for conservator and attorney fees, but we think such a use too broad. Essentially, Andrea's position turns section 3089 into a terminating sanction. What is forgotten is that attorney and conservatorship fee orders are independently enforceable. (See *Newland v. Superior Court* (1995) 40 Cal.App.4th 608, 610 [because previous attorney fee sanctions are independently enforceable, it is an abuse of discretion to impose a terminating sanction on a litigant for failure to a previous attorney fee order].)

In fact, their independent enforceability played out in this case and demonstrates why the Legislature might not have considered it necessary to include such fees within the ambit of section 3080: The fee claims here were all paid from the liquidation of real property via lien claims even before Lynn had the chance to forward on the money to the conservator. Further, in a section 3089 situation, by definition the couple are still married, so attorney and conservatorship fee orders would represent judgments against the community estate just like any other judgment based on a community debt. (See *id*. at p. 615 ["These orders have the force and effect of a money

18

judgment, and are immediately enforceable through execution, except to the extent the trial court may order a stay of the sanction."].)

Division of community property, by contrast, is a much more drastic remedy that may, at least in situations like the Bowers, upset years of a couple's financial planning. And again this case provides an example as to why restraint in division might be necessary and thus why the Legislature gave trial judges discretion *not* to divide property as well as divide it. Lynn and David predicated their financial strategy on having a large number income-producing properties, the liquidation of which would necessarily reduce the income from those properties and set up a vicious cycle leading to of financial collapse. By ordering the lump sum payment of professional fees, the court appears to have upset that long-term strategy.[23]

C. *Application*

At the December 2013 hearing, the probate court proffered two fairly broad models of the scope of section 3089. The more extreme model of the two was expressed in the court's thought that the simple failure to comply "with *a* court order" (italics added) would trigger section 3089 – as if noncompliance with *any* order of the probate court could trigger a section 3089 division. Perhaps realizing that formulation was a bit much, a few moments later the court equated professional fees with support and maintenance.

In either case, the court's understanding was too broad under the relevant text and legislative history. And we would add this gloss to the Legislature's handiwork: In cases involving considerable amounts of litigation – and since conservatorship litigation often involves intra-family feuds that's a reasonable expectation – equating professional fees with support has the effect of unfairly penalizing the ability of the competent spouse to litigate his or her side of the story. The more such a spouse resists,

---

[23]     Whether it would be an abuse of discretion to do it if the court had used the right standard is not before us at this juncture.

19

the larger the other side's fees, and the harder it is to pay them. And again a vicious cycle is created making division of the community estate inevitable, particularly if, as the trial court required here, payment of one lump sum to one specific person is required, without even the equity of the competent spouse receiving credit for amounts paid from escrow via lien assertions.[24]

The relevant question was whether Lynn had refused to comply with a *support and maintenance order* under article 3, not whether she had refused to pay attorney and conservatorship claims in a lump sum to the conservator. And when it comes to actual support and maintenance, the fact is Lynn had continuously paid $12,000 and devoted almost three-quarters of the income of the marital estate to "maintain" David at Autumn Years. She also – late to be sure – managed to pay all or almost all of David's creditors, including the various professional fees in the liquidation of property.

Let's focus on that "almost all" for the moment. Perhaps, if the trial court had isolated those few creditor claims of the conservatorship that could be said to be for genuine support and maintenance – those few claims by creditors the Hitchmans identified as being for direct out of pocket expenses on David's behalf as distinct from professional fees – and *then*, having isolated those relatively small amounts, exercised its discretion under section 3089 divided the community property based *entirely* on them, we might be able to say the trial court's decision was harmless error.

But it is clear the probate court's misunderstanding of the scope of the statute affected its discretion under the statute. Thus the court did not deal with whether Lynn had actually paid creditors for a few arguably outstanding support expenses. What the court cared about was, to once again allude to the Sinatra song, that Lynn hadn't done

---

[24]     In the analogous situation of child support orders, payors can be given credit even for in-kind support they provide (see *Helgestad v. Vargas* (2014) 231 Cal.App.4th 719, 735) so we can see no reason Lynn should not have been given credit for the money that paid from escrows the various professional fee claims even assuming that professional fee claims are properly included with article 3.

20

it the court's way.  Under section 3089, that focus has to be on whether Lynn had refused to comply with an order for support and maintenance.

## IV.  DISPOSITION

The order of May 20, 2014, dividing the Bowers' community property is reversed, with directions to the trial court to consider again the question of whether the marital estate should be divided, using a standard of whether Lynn refused to comply with orders for the support and maintenance of conservatee David Bower, as distinct from paying professional fees.  In the interests of justice, each side will bear its own costs on appeal.


BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


THOMPSON, J.

Filed 5/16/16

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| Conservatorship of the Person and Estate of DAVID BOWER.<br><br>ANDREA BOWER, as Conservator, etc.,<br><br>    Petitioner and Respondent,<br><br>      v.<br><br>LYNN BOWER,<br><br>    Objector and Appellant;<br><br>DAVID BOWER,<br><br>    Objector and Respondent. | G050468<br><br>(Super. Ct. No. 30-2011-00471248)<br><br>ORDER GRANTING REQUEST FOR PUBLICATION |

        Appellant has requested that our opinion in this matter, filed April 15, 2016, be certified for publication. After reviewing the request, we have concluded the case indeed meets the requirements for publication. Pursuant to California Rules of Court, rule 8.1105(b), (c)(2), (4) and (6), the request is GRANTED.

The opinion is ordered published in the Official Reports.


BEDSWORTH, J.

WE CONCUR:


RYLAARSDAM, ACTING P. J.


THOMPSON, J.

2