Filed 7/29/16  Marriage of Chase CA3

<u>**NOT**</u> <u>**TO**</u> <u>**BE**</u> <u>**PUBLISHED**</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

# IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## THIRD APPELLATE DISTRICT

### (Tehama)

----

| | |
|---|---|
| In re the Marriage of LIDA S. and ROBERT R. CHASE. | C078694 |
| LIDA S. CHASE, | (Super. Ct. No. FL66325) |
| Respondent, | |
| v. | |
| ROBERT R. CHASE, | |
| Appellant. | |

Appellant Robert R. Chase and respondent Lida S. Chase were married in 1990. Their formal date of separation was in February 2012.  Lida petitioned for divorce in March 2012; Robert moved out of the family home in May 2012.  (In keeping with the style of briefing, we refer to the parties by their given names for clarity; no disrespect is intended.)  By the time of the trial in this matter, only their youngest children (twins born in Sept. 1996) were minors.

1

The trial court entered its judgment of dissolution in February 2013. As the assets of the parties were substantial, litigation over the disputed economic issues was protracted. After a seven-day trial in late 2013 and early 2014, the court filed its statement of decision in August 2014 (as amended Oct. 2014), and entered judgment in accordance with the statement of decision in January 2015. Preparation of the record on appeal and briefing were completed in January 2016.

On appeal, Robert raises some 28 discrete issues under 12 headings in the course of 35 pages of argument. The treatment of these issues is not deep. Except in one instance, we reject his claims. We will remand to give him the opportunity to address the one flaw, and shall otherwise affirm the judgment.

Beyond this brief overview, we will not set out a global summary of the evidence. Given the kaleidoscopic sweep of Robert's arguments, each of which turns on different facts, we will echo Robert's approach and incorporate the relevant portions of the record to which they relate in each part of the Discussion.

## DISCUSSION

We offer an observation at the outset, rather than iterate our dissatisfaction in each part of the discussion. As demonstrated in the portion of this opinion devoted to the sanctions that the trial court imposed (pt. 11.0, *post*), Robert's lawyer (who represents him on appeal) repeatedly staked out positions with little to no factual or legal basis. Whatever the boundaries of "zealous" advocacy over which this approach may have teetered in the trial court, given the restrictive standards of review on appeal involved in dissolution proceedings—to which Robert's lawyer pays only lip service (with most rulings being within the trial court's discretion, and substantial evidence applying to disputed questions of fact)—this appeal represents an abandonment of the duty of professional appellate advocates, even in furthering a client's interests, to evaluate *dispassionately* the record in light of the law. Robert's lawyer repeatedly ignores

2

evidence in support of the trial court's rulings, makes abbreviated "arguments" lacking any analysis, fails to identify portions of the record crucial to her contentions or mischaracterizes the record, and frequently leaves us flipping back and forth between her arguments and her statement of facts as we attempt to piece together the evidentiary underpinnings of her contentions, a practice this court has previously condemned. (*City of Lincoln v. Barringer* (2002) 102 Cal.App.4th 1211, 1239 & fn. 16.) We nonetheless attempt to respond as best we can to this briefing.

## 1.0 The Trial Court Did Not Abuse Its Discretion in Valuing Robert's Medical Practice

### 1.1 *Evidence and Ruling*

Robert is a well-regarded orthopedic surgeon whose practice draws patients from several counties around his Red Bluff offices. The practice generated monthly income of about $35,000, according to Robert's income and expense declaration (IED). (Given the size of the figures at issue in this appeal, here and elsewhere we will be generally rounding dollar values to the nearest thousand or to the nearest hundred where the amount is smaller.)

The parties jointly engaged the services of a certified public accountant (CPA) who is an expert appraiser of medical practices.[1] In his opinion, the orthopedic practice was worth $177,000. In making this calculation, the expert applied an average 38 percent collection rate to the presently outstanding accounts receivable. He derived this rate by two different methods. The first totaled all of the receipts from 2006 through 2011,[2] then

---

[1] Robert inappropriately refers to the CPA repeatedly as Lida's expert in his briefing.

[2] Given that the joint expert's report *expressly* limits its valuation to *presently outstanding* receivables based on a ratio derived from *2006 through 2011*, Robert's purported statement of fact in his brief that the joint expert "included as an asset accounts receivable from 1993 through 2008 in his opinion of value of the medical practice" is unsupported.

3

divided this amount by the total billings over the same period. The second "take[s] the total of payments and adjustments and divide[s] the total payments by that payment and adjustment total. That gives you the realization rate." Both came to 38 percent. The expert explained that using a period of years to compare billings with receipts averages out the lower collectibility of older receivables.

Apparently dissatisfied with this valuation, Robert hired his own CPA appraiser. Based on a report from a collections bureau that Robert used (without questioning its determination of whether an account was collectible or not, and without making any reference to the application of the statute of limitations to these accounts), Robert's appraisal expert adjusted the collectible amount of receivables owing more than 90 days, along with the receivables owing less than 90 days, coming to a total of presently outstanding receivables different than the joint appraisal expert. As the joint appraisal expert had "done some good work in calculating" the collection and realization rates, Robert's expert used the same percentage to apply to his own calculation of receivables, and came up with a "real" valuation of $85,000 for the receivables. As a result, he found the medical practice to be worth $133,000. The joint appraisal expert testified this treatment of receivables amounted to double discounting of the older debts, because they are reduced before applying the collection/realization rate.

Robert conducted his own review of his 90-plus-day receivables. *He* determined that the statute of limitations had not expired as to only $18,000 of the total. Therefore, he testified that the valuation his expert supplied should be further reduced to $120,000.

The trial court found the joint expert's value to be more reliable. It agreed that the value from Robert's expert was flawed because of the double discount.

1.2 *Argument and Analysis*

It appears Robert believes the standard of review involves a question of law. In point of fact, a trial court's valuation of an asset is reviewed for abuse of discretion,

4

which we will uphold as long as it is reasonable in light of the evidence at trial. (*In re Marriage of Honer* (2015) 236 Cal.App.4th 687, 694; *In re Marriage of Campi* (2013) 212 Cal.App.4th 1565, 1572.) Clearly, the evidence we have related above provides a reasonable basis for the trial court's selection of the valuation of the medical practice.

Robert's truncated assertion that "[s]tatutes of limitations must be considered" does not find any support in his citation to *In re Marriage of Fonstein* (1976) 17 Cal.3d 738, 748-749; the case does not even involve the statute of limitations, let alone its application to valuation of accounts receivable. Rather, the cited portion of the decision simply observes that the obligations attendant to assets must be distributed with them. He also cites *In re Marriage of Warren* (1972) 28 Cal.App.3d 777, 783, which states the unremarkable proposition that a receivable on which the statute of limitations has not yet run should be considered a community asset, thereafter asserting "the opposite would also be true." As a matter of basic logic, the inverse of a holding is not necessarily true. In any event, Robert has not provided any authority that receivables on which the statute of limitations has run must be excluded categorically as a matter of law, rather than through the averaged method by which the joint expert accounted for the uncollectibility of receivables. We therefore reject this challenge.

**2.0 There Appears to Be an Overlap of Support and Awarded Costs with Funds Withdrawn from Robert's Business Account After Separation**

2.1 *Evidence and Ruling*

At the time of separation (Feb. 2012), the joint personal checking account had a balance of $8,000. In the period from February to May 2012, Lida made 10 deposits to the family checking account totaling $48,000 drawn from a business account having a balance of $14,000 at the time of the joint appraisal expert's valuation in February 2012. (The first draw of $4,000 antedated this Feb. 29 report.) Lida prepared an exhibit listing the checks written during this period, characterizing the expenses as either joint

($32,000),[3] Lida's ($1,700), or Robert's ($12,000), Robert's total primarily reflecting his preference for large sums of cash to use at businesses that did not accept cash, and a payment to his attorney. Robert also identifies a check from the business account that Lida wrote to herself for $2,200 on April 26, 2012, checks written to the children after separation for $3,000, and a check written for a property tax payment of $3,500 for the "Rio Robles" property. (It is unclear whether the latter check involves one of the two residences, the agricultural property, or the commercial property identified in the judgment; Lida does not address any of these business account checks in her brief, nor are we directed to any point in the judgment that accounts for them). Lida continued to make payments after Robert moved out for joint costs incurred while he was still living there, but did not seek reimbursement for these.

It had been the financial practice of the parties to use the funds from the business account to pay for their living expenses from their personal joint checking account, rather than take paychecks for their services. Lida had always paid all of the bills.

In June 2012, the trial court awarded Lida temporary spousal and child support ($6,700 and $5,900, respectively) retroactive to March 5. It reserved the issue of any credits that might apply.

In its statement of decision, the trial court concluded that funds transferred from the business account to the household account while Robert still resided in the home simply continued the existing financial practice and supported both of the parties. It also noted that during this period, Lida was not being compensated for services she provided

---

[3] Among these joint expenses was a retainer to the jointly retained practice appraiser for $4,500. The trial court subsequently awarded Lida costs pendente lite of $6,000, which her attorney had sought for the cost of the appraiser. This would appear to represent a double recovery of her share of the cost of the expert, which the trial court can address on remand.

to the medical practice through May 2012. Moreover, Robert had failed to pay the full amounts of the ordered temporary support and had been held in contempt. It therefore denied Robert's request for reimbursement. It also found that the beginning balance of the joint personal account had been expended on joint expenses before support commenced, and therefore found this was already equally divided between the parties. Finally, the funds paid to the children were pursuant to a continuing directive from Robert's accountant, and therefore Robert was not entitled to any credit from Lida.

2.2 *Argument and Analysis*

In a throwaway argument at the outset of this section of his brief, Robert asserts Lida should be charged for her use of the $8,000 that was in the joint bank account on the date of separation. This disregards the trial court's finding that these funds were used for Robert's and Lida's joint expenses before the support order pendente lite went into effect, and thus this community property was evenly divided between the parties. The contention is accordingly frivolous.

Although Robert's primary argument is not exactly clear, it appears he asserts that Lida could not expend money from the medical practice—which was his separate property after the date of separation—on her share of their joint expenses and her separate expenses while also receiving the support orders pendente lite, at least without Robert receiving a credit against his support obligation for the money withdrawn for those expenses. He further argues the trial court could not take his contempt conviction into account, because the contempt order had already ordered him to pay the support arrearages. Lida does not respond to the arguments beyond stating the undisputed principle that it was proper to expend the income from Robert's business on their joint expenses while he continued to live in the residence.

Although it is hard to imagine that the figures involved are material in a property division of the size at issue in this case, we agree that conceptually there seems to be a

7

double recovery on Lida's part both to receive spousal support and child support *and* use Robert's separate property to pay her share of the joint expenses and her separate expenses for the three-month period involved (as well as the double recovery of her share of the expert's fee). (Cf. *Helgestad v. Vargas* (2014) 231 Cal.App.4th 719, 733 [father entitled to equitable credit against child support for actual support provided while living with child].) That Robert was not complying fully with the support order at the time should not have any bearing once the contempt order directed payment of the arrearages.

We will not "do the math," however. If Robert believes it is financially worthwhile to litigate this issue further, we will remand to allow him the opportunity.

**3.0 The Trial Court Did Not Err in Denying Reimbursement to the Community for Lida's 2011 Legal Expenses**

At issue is a payment for *$925* that Lida made for consulting with a family law attorney in mid-2011. She decided afterward to attempt to salvage the marriage. The trial court determined that this was a payment for a debt of a spouse during the marriage, and therefore was not subject to reimbursement.

"[T]he liability of community property is not limited to debts incurred for the benefit of the community, but extends to debts incurred by one spouse alone exclusively for . . . her own personal benefit." (*Lezine v. Security Pacific Fin. Services, Inc.* (1996) 14 Cal.4th 56, 64, citing Fam. Code, § 910, subd. (a).[4]) Citing two utterly inapposite cases where the principle was not at issue (*In re Marriage of Mahone* (1981) 123 Cal.App.3d 17, 25 [issue was whether wife's separate property rather than community entitled to reimbursement, and not trial court's ruling that preseparation obligation was husband's separate debt]; *In re Marriage of Jafeman* (1972) 29 Cal.App.3d 244, 267 [issue was reimbursement for spouse's withdrawals from

---

[4] Undesignated statutory references are to the Family Code.

8

community property to pay legal fees *during* the family law proceedings, presumably postseparation]), Robert apparently contends—without addressing the standard of review—that the trial court abused its discretion as a matter of law in failing to order reimbursement. The argument over this de minimus amount is frivolous. As Robert fails to establish any basis for finding as a matter of law that the trial court should have departed from the usual rule, we do not find an abuse of discretion.

**4.0    There Was Sufficient Documentation of Healthcare Reimbursement**

4.1    *Evidence and Ruling*

In 2008, Lida was at a rodeo where a bull charged the stands, goring and trampling her. Her injuries were extensive, requiring 14 surgeries in five years. This has left her 65 percent disabled. She uses a walker and needs assistance with household activities. When driving, she needs someone else in the car because she cannot fully turn her head. She had previously managed the medical practice for Robert and acted as a backroom nurse. However, when she was able to return to the office in 2011, she was limited to sedentary duties in managing the office.

Violating the automatic temporary restraining order contained in the summons, Robert cancelled the family's healthcare plan in June 2012. After consultation between counsel, Robert reinstated a less extensive plan. This was another ground for the trial court's contempt order, which directed Robert to pay the difference in costs between the two policies.

At trial, Lida testified the former plan had a copayment of $1,750 per person per year. The current plan requires a copayment of $7,500 per person per year. (Both plans have a 30 percent copayment until the caps are reached.) The copay for doctor visits is now a flat $40, which does not count toward the cap. The copay for prescriptions was formerly $250 and is now $750. Her healthcare premiums are presently $645 per month. The new plan in essence is for catastrophic coverage, which Lida did not think is suitable

9

for someone with chronic conditions such as herself.  She submitted exhibits consisting of her summaries of the increased costs, supported with hundreds of pages of copies of her medical billings, receipts, and checks.  In response to some objections from Robert before trial, Lida made adjustments.  She calculated a total of $14,400 in additional healthcare expense for 2012, which Robert paid.  She calculated a total of $17,600 in additional healthcare expense for 2013 that was still outstanding.

The trial court found that the details of the difference between the two policies had not been sufficiently established by the evidence.  It therefore limited the reimbursement for the 2013 medical expenses to $7,500.

4.2 *Argument and Analysis*

In a scant six sentences, Robert contends Lida's documentation of her expenses is "confusing," and (despite the lengthy exhibits) failed to itemize sufficiently the $7,500 that the trial court awarded.  Beyond his complaint that Lida should have submitted some unspecified type of "printout from her insurance company" instead of invoices, receipts, and checks (failing to note where in the record he lodged such an objection in the trial court), Robert does not elaborate on his conclusory assertion that "[n]ecessary details were not provided," for which reason he claims Lida did not satisfy her burden of proof.  In his reply brief, Robert asserts for the first time that he is also disputing an order to pay Lida $26,000, which appears in the minutes of an untranscribed proceeding on July 24, 2013 (which cross-references still another untranscribed hearing on March 22, 2013); Robert baldly asserts this represents additional reimbursement for medical expenses.  Not only does the latter contention come too late (*County of Sonoma v. Cohen* (2015) 235 Cal.App.4th 42, 51, fn. 13), the minutes are insufficient to support his claimed interpretation of the order.  (The minutes state the court ordered the $26,000 "to be paid *to* the Respondent" (Robert).)  We therefore disregard the latter argument.

10

As for the former argument, it is frivolous (if not forfeited). The trial court did not find anything lacking in Lida's documentation of her expenses; it found that there was an insufficient explanation of the manner in which it should calculate a formula for assessing the difference in out-of-pocket costs between the original and new policies. Robert does not provide any authority for limiting the manner of proof of these expenses to a printout from the insurer. Robert does not argue otherwise that the amount awarded represents an abuse of discretion. We therefore reject this claim.

**5.0    The Trial Court Did Not Err in Setting Spousal Support**

Robert raises a mélange of issues in connection with the trial court's award of $4,500 per month in spousal support through September 2014, and $8,000 per month thereafter. None of these has any merit.

5.1    *The Court Did Not Impermissibly Rely on a Formula in Setting Support*

The portion of the judgment awarding spousal support recites the 14 factors specified in section 4320 for setting permanent spousal support. These included the duration of the marriage (21-plus years), the upper class lifestyle of the family, Lida's disability, her contribution to Robert's medical practice, Robert's average monthly income of $34,000 and expenses of $13,000 (including child support and legal fees), Lida's having a debt-free home that is superior to Robert's, Lida's separate property and award for her injuries, the minimal factor of Lida's surreptitiously administering antidepressants to Robert in his coffee, the tax implications of spousal support, the adverse effect on Lida's Social Security and Medicare benefits of not drawing a salary while working at the practice, and the imminent majority in September 2014 of the couple's youngest children. In the course of its analysis, the trial court noted it found Lida's expert "presented income figures based on the couple's last four years of marriage to show how much net monthly disposable income was available to them during the marriage and how much spousal support would be necessary to maintain their established

11

marital standard of living."  The court found him to be "a credible witness" who offered an opinion that $8,500 in support would be necessary, though the court also considered "the drawbacks to his opinion" that Robert's lawyer pointed out during cross-examination.

Robert contends the expert impermissibly relied on a statutory formula for setting child support.  (*In re Marriage of Schulze* (1997) 60 Cal.App.4th 519, 525-527 ["uncanny closeness" of permanent support award to formula for temporary support cannot justify appellate finding of "independent exercise of judicial discretion"; figure must be "zero-based" rather than adjusted from amount of formula for temporary support]; accord, *In re Marriage of Zywiciel* (2000) 83 Cal.App.4th 1078, 1081-1082 [no reasoning in order, to which computer printout of amount for temporary support under formula was attached].) He notes the expert testified that he derived his estimate of disposable income after reviewing four years of the couple's tax returns, after which he used the multiplier from section 4055, subdivision (b)(4)'s child support guideline to give him "a sense of what the formula would provide for an individual" in a household of five persons, using the figure for a five-person household (2.5) to divide the total disposable income in a manner that reflects the fact of a mix of fixed and variable expenses.  This divisor does not vary the resulting figure significantly when adding or subtracting one person.  An exhibit reflected these calculations:  an average monthly total disposable income from 2008 to 2011 of $23,000, with a figure per person of $9,300.  The expert then adjusted this figure to reflect Lida's separate annual investment income of $41,000, which she will now need for support rather than reinvestment as during the marriage, and any tax implications of spousal support.  For Lida's investments, he attributed a low risk return of 1.5 to 2.5 percent; he realized federal bonds paid 4 percent, but this would be taxable and inflation would erode the return (which is particularly risky given Lida's age and unforeseen medical needs).

12

Unlike the authority Robert cites in which it was evident that the trial courts relied on the formula for calculating temporary support with only a nod to the statutory factors applicable to permanent support, the instant support order thoughtfully considered each of the 14 factors. The expert's opinion underlying the order did not generate its amount by means of any impermissible formula. The expert used a legislative finding (much as he could have used one from a reference book) regarding the increment to be applied as the size of a sibling group increases to reflect the variable expense associated with support for each additional child, and used it as a divisor to determine Lida's share of the total disposable household income. It is a logical calculation. We accordingly reject Robert's argument.

5.2    *The Trial Court Was Not Obligated to Adopt Robert's Calculation*

After making the undisputed point that the marital standard of living is only a starting point for the calculation of permanent spousal support, Robert appears to argue that the expert's reliance on disposable income results in too high a figure compared with Robert's own calculation of actual expenses for the household, which apparently— among other decisions—excluded money given to their adult children. The trial court, however, was not under any obligation to accept Robert's figures in particular or an expense-based method in general. (*In re Marriage of Ackerman* (2006) 146 Cal.App.4th 191, 208 (*Ackerman*) [standard of living may be based on income alone rather than expenses].) The disposable income reflects the resources that had been available for the choices the parties made in its use, whether it be acquisitions, savings, or distributions to children. (*In re Marriage of Drapeau* (2001) 93 Cal.App.4th 1086, 1097 [amounts devoted to savings are appropriate component of marital standard of living; no rule requires reliance on actual expenditures alone in all cases].)

One other point inappropriately admixed under this heading (*Imagistics Internat., Inc. v. Department of General Services* (2007) 150 Cal.App.4th 581, 593, fn. 10

13

(*Imagistics Internat.*) [" 'lurking' " argument lacking logical connection to heading is forfeited]) faults "the calculation of all income including [Lida's] substantial separate property's income" as being inappropriate "to approximate the parties' standard of living." But Lida's lifestyle had given her the ability to save, which will now be needed for her own support (offsetting the total amount of support Robert must pay). This claim is thus not well taken.

### 5.3    *Robert Fails to Establish That the Trial Court Ignored Assets*

Robert contends the trial court *could not have* taken into account the assets each party would obtain under the property settlement because counsel did not prepare a statement of assets and values until after the court had made its calculation of support. He also makes the unsupported assertion that the trial court failed to allocate accounts appearing in a pretrial stipulation. (In addition, he reiterates the arguments regarding the failure to use his calculations of the marital expenses, which is not any more persuasive in this context.)

The record belies this frivolous argument. Attached to the statement of decision was the 34-page jointly prepared statement of assets and valuations, and the proposed distribution. The subsequent judgment divided the assets either in the manner proposed or resolved disputes, and determined the equalizing payment of $92,000 from Robert to Lida. The judgment also addresses the accounts specified in the pretrial stipulation. Since this evidence was before the trial court at the time of its ruling on spousal support, it is presumed that the trial court took it into account *absent affirmative evidence to the contrary*. (*Christian Research Institute v. Alnor* (2008) 165 Cal.App.4th 1315, 1324 (*Christian Research*); Evid. Code, § 664.) Robert has not provided any. We therefore reject the argument.

14

### 5.4 *The Exact Nature of Kwart's Holdings Was Not Necessary in Setting Spousal Support*

Lida provided annual tax returns and Schedule K-1's to show the value of her capital account in Kwart (her family name), an investment partnership that she and her siblings held and from which her sister (who apparently managed the investment) would send disbursements to Lida. Contrary to Robert's representation in his brief, Lida provided him with Schedule K-1's dating back to 1997.

Robert asserts that capital accounts are not always sufficient proof of the value of a spouse's interest in a partnership, though none of the cases he cites stands for that proposition (*In re Marriage of Fonstein*, *supra*, 17 Cal.3d at pp. 745-746 [basing value on percentage specified in withdrawal agreement]; *In re Marriage of Iredale & Cates* (2004) 121 Cal.App.4th 321, 329 [*within* court's discretion to base value of partnership interest on capital account]; *In re Marriage of Slater* (1979) 100 Cal.App.3d 241, 245-246 [valuation of goodwill in medical practice]). He contends that it was necessary to identify the exact nature of Kwart's holdings, because the values assigned to them might not be their actual worth.

Robert entirely fails to explain the relevance of the underlying assets to the process of determining spousal support. Robert does not point to any evidence that Lida has the ability to liquidate the underlying assets such that an undervaluation would be material. The trial court took account of her income derived from these assets, and the extent of her interest in the partnership. The identity or valuation of the partnership assets accordingly does not have any bearing on support.

### 5.5 *The Trial Court Was Not Obligated to Impute the Government Bond Rate to Lida's Investments*

As noted above, Lida's support expert did not believe the return on government bonds was an appropriate investment for Lida, given her age, medical issues, inflation, and tax consequences. Robert now asserts in a one-paragraph "argument" that bond rates

15

were used in *Ackerman*, *supra*, 146 Cal.App.4th at page 211 (which does not hold that they *must* be used), and thus the trial court "was incorrect in ordering that no credible evidence was produced by [Robert] to impute income on [Lida's] assets" (failing to provide any citation to the record reflecting any such order). Lida's expert in fact *did* impute an interest rate to her separate property in the 1.5 to 2.5 percent range, as noted above. The expert's testimony is substantial evidence for the trial court's decision not to employ the bond rate, and Robert fails to explain why this would be an abuse of discretion.

5.6     *The Trial Court Properly Declined to Impute Income to Lida*

In declining to impute income to Lida at Robert's request, the trial court rejected Robert's expert testimony that Lida was employable as a nurse. It relied instead on Lida's vocational expert, a senior counselor at the Department of Rehabilitation. Citing evidence favorable to him in a single paragraph, Robert casually asserts in one sentence of argument thereafter that the "basis for not imputing income does not comport with the facts the court cites as the basis for the court's opinion."

This court will not do Robert's work for him. It is the obligation of an appellant not only to summarize the facts *fully* in a challenge to the sufficiency of the evidence to support a ruling, but to explain meaningfully *why* the supporting facts are insufficient as a matter of law. Having failed to do so, Robert has forfeited his incredible argument that a person with the extent of Lida's injuries, as extensively summarized in Lida's brief, is capable of earning a living. (*Doe v. Roman Catholic Archbishop of Cashel & Emly* (2009) 177 Cal.App.4th 209, 218; *Hauselt v. County of Butte* (2009) 172 Cal.App.4th 550, 563.)

5.7     *The Trial Court Did Not Abuse Its Discretion in Making an Implied Finding That Lida's Separate Property Was Insufficient to Support Her*

Robert asserts that "it appears" the trial court "considered [only] the parties' income in ordering spousal support," rather than the entirety of Lida's separate property. He fails to demonstrate that there is any evidence in the record that the capital in her

16

investments was available or sufficient to replace the $8,000 award in monthly support beyond her separate income, or that the trial court in fact improperly disregarded the value of the investments (*Christian Research*, *supra*, 165 Cal.App.4th at p. 1324). We accordingly reject his claim.

      5.8    *The Trial Court Was Not Obligated to Adjust Support for Commission of Domestic Violence*

Misstating the trial court's finding, Robert asserts it was an abuse of discretion not to find that domestic violence on Lida's part occurred. In point of fact, as we noted above, the trial court acknowledged Lida's deposition testimony[5] and Robert's trial testimony that for a period of time she had surreptitiously administered antidepressants to Robert (that his doctor had prescribed) in an effort to improve his affect and save their marriage. When she told him she was doing this, he told her to stop. Any bleeding he experienced was attributable to hemorrhoids. Robert, on the other hand, claimed the bleeding was attributable to the medication, as were tremors and vision issues. His gastroenterologist contradicted him about the bleeding, and Robert admitted he did not consult with anyone about the purported changes in vision or the tremors. Ultimately, the trial court did not give much weight to this factor in setting support because it did not find any criminal intent on Lida's part, and did not believe the testimony about Robert's claimed injuries.

Robert asserts that this constituted domestic violence as a matter of law. However, he does not analyze why it would be an abuse of discretion for the trial court not to give such weight to this factor that it should affect the amount of support. We accordingly do not find an abuse of discretion in this regard.

---

[5] She declined to testify on the issue at trial because Robert had succeeded in getting the district attorney to investigate his claims of poisoning.

**6.0  The Trial Court Did Not Misallocate the Burden of Proof with Respect to the Character of Lida's Investments**

Citing the undisputed presumption that property *acquired during marriage* is presumed to be community property absent proof of tracing its source to separate property, Robert contends the trial court erred in concluding Lida's Charles Schwab IRA account was her separate property acquired prior to marriage (based on her testimony to this effect) as to which there was an absence of any evidence of commingling, and her other Charles Schwab account also had its original source in an antenuptial account, again without any evidence of commingling.  As to the latter account, the court found a transmutation to community property in 2001, crediting Lida with the value on that date of $160,000 as separate property.  Robert himself admitted that Lida had separate accounts when they married, which ultimately became the Schwab accounts at issue.  Conceding the absence of any evidence of commingling, Robert contends there is an absence of *documentary* evidence that traces these Schwab accounts to their antenuptial origins, and the trial court's ruling as a result improperly imposed the burden on him to prove the community nature of these assets.

Robert's authority for the insufficiency of testimony to establish separate property involves commingled accounts, where tracing is required.  (*Estate of Murphy* (1976) 15 Cal.3d 907, 919; *In re Marriage of Mix* (1975) 14 Cal.3d 604, 614; *In re Marriage of Frick* (1986) 181 Cal.App.3d 997, 1011; accord, *In re Marriage of Ficke* (2013) 217 Cal.App.4th 10, 25 [need for specific records and documents to trace funds "is thus predicated on the existence of a commingled account"].)  In the present case, with an absence of any evidence of commingling, Robert does not provide any basis for requiring more than Lida's testimony (and his concession) regarding the change of form of this separate property (there not being any evidence of community contributions) from one account to another.  We therefore reject the argument.

18

**7.0    The Community Is Not Entitled to Reimbursement for Income Tax Expense on Kwart Income**

Based on the testimony of Robert's witness, the trial court found that from 1997 to 2011 the community paid $282,000 in taxes on Kwart income attributed to Lida on the couple's tax returns.  During the same period, the community received $385,000 in distributions from Kwart.[6]  (Robert admitted at trial that he was seeking community reimbursement only to the extent that the tax payments had exceeded Kwart income received.)  The trial court did not find any basis for reimbursing the community.

After a lengthy nongermane digression regarding breaches of fiduciary duties (an issue on which the trial court found to the contrary), Robert at last gets to the point:  The community paid income tax on Lida's Kwart earnings, but Lida *asked for* a credit for any income from Kwart as her separate property (§ 2640); Robert misrepresents that the trial court *ordered* a credit to Lida for *these* Kwart distributions to the community (in contrast with the credit discussed in pt. 8.0, *post*).  He contends the community is therefore entitled to reimbursement for its paying the income tax on the distributions.

The community received separate property contributions far in excess of its payment of separate property expenses.  Robert did not demonstrate that Lida was given section 2640 credits for *these* contributions to the community, and thus does not establish any error in failing to order reimbursement to the community for the tax payments.

---

[6] In the midst of his argument on this issue, Robert purports on appeal to be unaware of the use of a significant Kwart distribution wired to the business account in 2007.  Lida testified that it was used to offset a significant Kwart tax liability, as Robert's accountant confirmed at the time.  In his statement of facts, Robert also adverts to the community's paying legal expenses in connection with Kwart, but this is not included in the body of his Kwart arguments.

**8.0     The Trial Court Properly Credited Lida for a Kwart Distribution to a Community Investment Account**

The trial court *did* give a credit to Lida for separate property contributions of $38,300 to a community investment account from Kwart in 2000 and 2001. Lida noted that this was intended to cover tax liability for Kwart in 2000, but the trial court found that the parties had failed to supply any evidence of the amount of tax liability or the manner in which it was actually paid. The parties do not make clear whether these distributions were in addition to the distributions involved in our discussion in part 7.0, *ante*. The trial court awarded reimbursement to Lida for these contributions before dividing the balance of the community investment account.

Robert contends Lida should not be given credit if the community bore the tax expense for her separate property. There are two major flaws in this claim. First, it ignores the absence of any evidence of the tax liability for Kwart in 2000. More importantly, it disregards the more than $100,000 benefit the community received from Kwart for the period at issue above, which more than offsets any failure to reimburse the community for any 2000 tax expense while crediting Lida for the contribution.

**9.0     The Trial Court Properly Did Not Charge to Lida the Loss of Value in a Car Wrecked While in Her Possession**

The couple's adult son wrecked a jointly owned 2008 BMW valued in excess of $20,000 in an accident on his way home after Robert moved out of the house. (The son admitted to Robert that he had been drinking.) Robert testified that he would not have allowed the son to drive that car, and suggested that Lida had allowed the son to drive it despite the fact he had been drinking. Its salvage value was $4,000.

In an amendment to its statement of decision (which Robert disregards), the trial court found that Robert had failed to provide any legal authority for charging Lida for the loss of value to the car. In any event, Robert had failed to establish a causal link between any act of Lida and the loss of value.

20

Robert makes a skeletal argument in which he asserts the undisputed principle that a party can be charged with the postseparation destruction of community assets (*In re Marriage of Stitt* (1983) 147 Cal.App.3d 579, 588 [responsible party must bear cost of loss to community property]). He then contends there is a remedy for every wrong in an equitable proceeding such as this, before stating ipse dixit without analysis that the lower court erred. His reply brief does not return to the issue.

Assuming Robert's inadequate manner of addressing the issue does not forfeit our consideration (*People v. Oates* (2004) 32 Cal.4th 1048, 1068, fn. 10), we reject the claim. Other than possible hearsay assertions from the son, Robert did not present any *evidence* that Lida was precluded from allowing their adult son to use the car, or that she was in any way negligent in entrusting it to him. Robert's contention thus falls flat.

## 10.0 Robert Fails to Establish an Abuse of Discretion in Denying His Request for Sanctions

Robert asserts the trial court abused its discretion in failing to grant the request in his posttrial brief for sanctions and legal fees for a number of Lida's actions. He limits his contention on appeal to six instances of the 21 identified in his motion. The instances included in his opening brief are: (1) Lida's failure to provide an accurate statement of her income in her IED; (2) allegedly inadequate information about the value of her separate holdings in Kwart, or any community expenditures on Kwart; (3) a failure to disclose transfer before trial of separate property funds from one account to another or the withdrawal of funds, which also violated the automatic restraining order; (4) a failure to provide a timely disclosure before trial of an appraisal of her jewelry; (5) in response to an *informal* request from Robert's lawyer, a failure to share a rental survey Lida's attorney commissioned for the commercial building they owned in which Robert's medical practice was located; and (6) the postseparation withdrawals of the separate property funds from Robert's business account.

21

The trial court concluded: (1) *both* parties had made inadvertent financial mischaracterizations in their IED's, so Lida's errors did not warrant sanctions; (2) Lida had provided all information about Kwart's valuation that her sister had given to her, and Robert in any event had 15 years of Schedule K-1's in his possession, establishing the value of Lida's holdings; in addition, the issue regarding community expenditures on Kwart was a disputed subject of litigation and not a basis for sanctions; (3) nothing was involved in the transfer of the separate funds other than a change in brokerages, which did not harm the community or result in additional litigation and was at most a technical violation of the restraining order, and Robert's lawyer stipulated to the amounts of withdrawals at trial; and (4) Lida had submitted the jewelry appraisal to Robert weeks before her witness testified in rebuttal to Robert's unsubstantiated claim of a $75,000 community interest, and the court had already overruled Robert's objection to the appraisal on the grounds of untimely disclosure—a ruling Robert does not challenge on appeal; we also note Robert's lawyer ultimately stipulated to admission of the appraisal.

A decision on awarding sanctions is reviewed for whether substantial evidence supports a reasonable exercise of discretion. (*Parker v. Harbert* (2012) 212 Cal.App.4th 1172, 1177.) Robert's brief does not address the reasoning in any of the trial court's rulings.[7] He does not suggest that the rulings on these subjects lacked substantial evidence in support. He simply asserts the legal bases on which he urged imposition of

---

[7] The trial court did not expressly rule on the rental survey report or the use of Robert's business account after separation. However, as noted above, it had expressly ruled that Lida's use of the business account was a standing practice from which Robert benefitted as much as she before moving out; it is inconceivable that any court could find a basis for sanctions in her failure to concede before trial that Robert was entitled to return of these funds in their entirety merely on his demand. As for the rental report, as noted above, this was the work product of Lida's attorney. Robert does not provide any authority that it is sanctionable to fail to disclose work product without a formal request to exchange expert information. Robert thus fails to demonstrate error in failing to grant sanctions on these two points.

sanctions without any effort to establish that the trial court's rulings were unreasonable, as if this court were ruling on them in the first instance.

It is an appellant's obligation to demonstrate error in a trial court's rulings. (*Imagistics Internat., supra*, 150 Cal.App.4th at p. 588; *Independent Roofing Contractors v. California Apprenticeship Council* (2003) 114 Cal.App.4th 1330, 1336.) Robert's brief does not amount to anything more than an invitation for this court to decide the matter differently. We decline to find any abuse of discretion under these circumstances.

## 11.0 Robert Fails to Establish an Abuse of Discretion in the Award of Sanctions Against Him

In deciding whether Robert should be sanctioned, the court ruled, "[Robert] made numerous baseless allegations against [Lida]. He took numerous positions with no factual or legal basis. He continued to allege that [Lida] transferred [community] money into [a separate] account when the facts showed the transfer was an internal transaction only[, which] was completely independent of [Lida's] actions. Another example is [Robert's] contention that [Lida's] separate property interest in [Kwart] was transmuted into community property by virtue of her oral representations. Although the law is clear that a writing [is] required to transmute this property interest, [Robert] continued to make this argument. [Robert] made allegations of commingling when he [did not have any] evidence to prove it. One argument, without support, was that [Lida] must have shredded the documents or just not provided the documents that would have shown the commingling. When neutral experts . . . made conclusions of value [with which] he did not agree . . . he claimed they were not neutral and were in on a 'conspiracy' with [Lida] and [her] attorney. [¶] . . . As stated earlier it is not sanctionable conduct to hold to a legal or factual position; however, when nearly every position turns out to be without legal or factual basis it becomes evident that the positions are unreasonable and that they

23

are taken to frustrate the possibility of settlement." As a result, "[Robert] is ordered to pay $20,000.00 in [Lida's legal] fees pursuant to [section] 271."

Robert admits "the lower court did rule against [him] on almost every issue" but disputes he lacked legal or evidentiary basis for them. However, the trial judge who oversaw this litigation found that Robert's *entire* course of litigation conduct was taken to frustrate the reasonable course of the proceedings, even beyond the grounds cited in the ruling. We cannot fathom an issue on which we would defer more to the trial court. Indeed, the nature of Robert's briefing on appeal, which has staked out one unreasonable position after another, demonstrates that the trial court properly exercised its discretion in sanctioning him on these specific grounds (as to which Robert does not assert any defect in notice). (*Parker v. Harbert*, *supra*, 212 Cal.App.4th at p. 1178 [due process requires notice of grounds for award of legal fees under § 271].) We turn to Robert's challenges to the individual grounds cited in the ruling.

Robert contends the first example in the court's ruling was justified conduct because he could not determine the nature of the transaction, given that Lida in a deposition could not explain a December 2006 transaction in her statement. He claims he instead needed to await an accountant's explanation at trial to confirm that this was indeed an internal reallocation. However, he fails to explain why his lawyer, who at least from the time of the deposition had the document in her possession, could not have obtained this interpretation *well before trial* rather than persist in the assertion. The trial court thus properly cited this as an example of unjustifiable litigating tactics.

Robert evades the express point of the second example. Absent a writing, Lida's alleged oral representations characterizing her investment accounts as being community property were ineffective, as presumably his lawyer should have been aware. There not being any justification whatsoever to claim the contrary, this was a proper basis for a finding that he and his lawyer litigated in bad faith.

24

Robert instead tries to focus his challenge to the second example on his unproven claims that Lida commingled community funds with her separate property. He contends that he did not have access to her financial documents, some of which she admitted shredding over the years. What he does *not* explain is why he could not have determined—from the personal checking account out of which Lida paid all their expenses or the business accounts for which he retained all records—whether there were unaccounted community funds sent to her separate investments. His pure speculations to the contrary did not justify litigating the issue, and support the trial court's citation to this as an example of unreasonable litigation behavior.

Finally, he contends he was justified in questioning the valuation put on his medical practice and on their real property by the jointly engaged appraisers. Once again, Robert attempts to evade the actual nature of the trial court's finding. The trial court chided him for *impugning the integrity* of the experts as being in collusion with Lida: To quote his testimony, "[Lida] did this behind my back . . . . [The practice appraiser] was a hired gun . . . . [T]here was false information given to the court by you [(Lida's counsel)] and Lida that I had agreed to [the practice appraiser] valuing th[e] practice"; "Just because [the practice appraiser] states in correspondence [that he was jointly engaged] to try to make it more acceptable, that correspondence is a fib"; and "it was an insult to have [the property appraiser] come here with an appraisal at $750,000. That was collusion between Lida, [her attorney], and [the appraiser]." These comments more than warrant the trial court's finding of unjustifiable trial tactics.

In short, Robert does not provide any basis on appeal for us to find any abuse of discretion on the part of the trial court. We therefore reject this argument.

## 12.0 The Trial Court Properly Ordered Payment of a Portion of Lida's Legal Fees

Prior to trial, Lida had incurred legal fees of $52,000. By the end of trial, these amounted to $92,000. In addition to the $20,000 in legal fees awarded as a sanction above, the trial court had first awarded Lida $45,000 of her legal fees under sections 2030 and 2032 "considering what is just and reasonable, as well as [Robert's] trial tactics discussed [subsequently] . . . ."

In desultory fashion, Robert asserts Lida was able to pay her own legal fees. This, of course, is not a bar to an award of legal fees: "[I]n determining whether to award [legal] fees to one party, the family court may consider the other party's trial tactics"; the award is then reviewed for an abuse of discretion. (*In re Marriage of Sorge* (2012) 202 Cal.App.4th 626, 661-662.) He baldly states that his "trial tactics were appropriate . . . [as] responded to above [in connection with the legal fees awarded as a sanction]" and "there was no showing the lower court weighed or considered any of [Lida's] bad conduct" (specifying only the erroneous IED's discussed above that the court determined were the result of inadvertence) or his "legally justified positions," declaring the award to be an abuse of discretion as a result.

We will not repeat ourselves at length. For the reasons discussed in part 11.0, *ante*, the trial court was more than warranted in awarding legal fees to Lida on the basis of Robert's trial tactics, as confirmed for us by his appellate tactics. The court was not obligated to make an express finding regarding Lida's conduct, because (1) it discussed his allegations regarding her conduct at length as noted in part 10.0, *ante*, and (2) we reiterate that it is presumed a trial court gave consideration to all relevant evidence *absent affirmative evidence to the contrary*. (*Christian Research*, *supra*, 165 Cal.App.4th at p. 1324; Evid. Code, § 664.) We accordingly do not find any abuse of discretion.

## DISPOSITION

The matter is remanded to allow Robert to relitigate the issue of possible double credit to Lida in receiving temporary spousal and child support at the same time she was using Robert's separate income to pay her share of joint expenses and her separate expenses for the period of February 2012 to May 2012, and in paying her share of the practice appraisal retainer from Robert's separate funds.  We otherwise affirm the judgment.  If Robert does not move to reopen these issues within 30 days of the issuance of our remittitur, the trial court shall reinstate the judgment.  Lida shall recover her costs of appeal.  (Cal. Rules of Court, rule 8.278(a)(1), (2).)


                                                     BUTZ            , J.


We concur:


      RAYE            , P. J.


      MAURO         , J.